UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Western Division

| | |
|---|---|
| Catherine Hutchinson, by her guardian, Sandy Julien; Raymond Puchalski, by his guardian Nickie Chandler; Glen Jones, by his guardian Steven Jones; and Nathaniel Wilson, on behalf of themselves and all others similarly situated; and <br><br> The Brain Injury Association of Massachusetts <br><br> Plaintiffs, <br><br> v. <br><br> Deval L. Patrick, Governor; JudyAnn Bigby, Secretary of the Executive Office of Health and Human Services, Leslie Kirwan, Secretary of the Executive Office of Administration and Finance; Thomas Dehner, Acting Director of Mass Health, Elmer C. Bartels, Commissioner of Massachusetts Rehabilitation Commission <br><br> Defendants. | Civil Action No. 07-30081-MAP |

## CLASS ACTION COMPLAINT

### I. INTRODUCTION

1. Named plaintiffs Catherine Hutchinson, Raymond Puchalski, Glen Jones and Nathaniel Wilson (hereafter "the plaintiffs") have serious brain injuries that substantially impair basic life skills and require ongoing rehabilitation and support. Each of these individuals is qualified for the defendants' system of long term care services for persons with disabilities, including Medicaid services. Each is unnecessarily institutionalized in a nursing or rehabilitation facility because of the defendant's failure to provide these services and support in appropriate,



1

integrated community settings. Instead, the defendants require these individuals, and hundreds of other individuals with brain injuries, to live in facilities segregated from the community as a condition of receiving care and assistance.

2. Approximately 8000 individuals with brain injuries currently reside in nursing and rehabilitation facilities in Massachusetts. At least a quarter of these individuals are able to, and prefer to, live in integrated community settings with appropriate supports. In the absence of these services, they remain unnecessarily institutionalized, sacrificing their personal liberty, autonomy and freedom of association, as well as meaningful access to community life, in order to receive care and treatment for their disability. Hundreds more individuals with brain injuries are at risk of admission to such facilities just to receive the limited rehabilitative services that the defendants do provide.

3. Despite their ability to benefit from community-based supports, all of these individuals, and others similarly-situated, are experiencing or will experience unnecessary and prolonged institutionalization in violation of the Americans with Disabilities Act (ADA). 42 U.S.C. § 12132 *et seq*; 28 C.F.R. § 35.130(d) *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"). 29 U.S.C. § 794(a) *et seq.*

4. The brain injuries experienced by these individuals are profound and life changing, but they need not result in a lifetime of institutional care. Like persons without disabilities, these individuals need "family relations, social contacts, work options, economic, independence, educational advancement and cultural enrichment." *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). Their medical and rehabilitative needs can best be met in community settings, which have been demonstrated to improve skills, promote rehabilitative goals, and facilitate independence for persons with brain injuries and other severe disabilities. These

individuals are entitled to receive services in the most integrated setting appropriate for their needs and should not continue to suffer the isolation and indignity of institutional care because of the defendants' ineffective reliance on institutions like nursing and other long term care facilities.

5. The defendants' excessive use of institutions to care for persons with brain injuries is longstanding. Many individuals with brain injuries have been determined by their treatment professionals to be ready for placement into a community setting, but these professional recommendations have not been implemented for many years due to the lack of appropriate alternatives. Despite knowledge of these recommendations, of the professional consensus about the benefits of community living, of the cost-effectiveness of non-institutional alternatives, and of the mandates of federal law, the defendants have not made reasonable efforts to develop community alternatives to institutional confinement for persons with brain injuries.

6. Instead, the number of persons with brain injuries who remain needlessly institutionalized in nursing and rehabilitation facilities in Massachusetts has *increased* over the past decade. There has been no meaningful effort by the defendants, through the Executive Office of Health and Human Services (EOHHS) and other state agencies, to create community alternatives for these individuals. Moreover, the defendants have failed to develop and implement a comprehensive and effectively working plan to move individuals with brain injuries into the community at a reasonable pace.

7. In fact, defendants have effectively denied nursing and rehabilitation facility residents access to their two, small community services programs for individuals with traumatic brain injuries. The defendants fail to inform nursing and rehabilitation facility residents of these programs, fail to assess them for these programs, and fail to afford them equal access to these programs. Moreover, the defendants administer these programs in a discriminatory manner,

purposefully excluding individuals with acquired brain injuries or who, because of the severity of their disability, find themselves with no option but to be admitted to a nursing or rehabilitation facility for long term care.

8.  By requiring these individuals, and others similarly situated, to submit to institutionalization as a condition for receiving long term care, the defendants cause the plaintiffs to experience unnecessary regression, deterioration, isolation, and segregation. This segregation "perpetuates unwarranted assumptions" that these individuals are "incapable or unworthy of participating in community life." *Olmstead*, 527 U.S. at 600.

9.  As Medicaid-eligible individuals, the plaintiffs are entitled to a choice of institutional and community settings, 42 U.S.C. § 1396n(c) *et seq*, including reasonable access to the defendants' federally-funded Home and Community-Based Services (HCBS) waiver program. Instead, the defendants have failed to administer this Medicaid program in an efficient and effective manner, providing inadequate notice of, and access to, the HCBS program.

10. Even within nursing facilities, the defendants provide these individuals, and others like them, limited access to rehabilitative services such as speech, occupational and physical therapies. The provision of nursing and related services is often based on a person's needs in the institutional setting, as opposed to the rehabilitative services necessary for successful community integration. The denial of these medically necessary therapies, all of which are Medicaid- covered services and which must be provided promptly and as long as medically necessary under the law, further impedes the plaintiffs' prospects for recovery and for independent community living. Over time, this failure to provide necessary services has resulted in significant deterioration of the plaintiff's basic functioning, abilities, and medical condition.

11. The defendants' failure to provide community-based support services has caused, and will continue to cause, serious, long-term, and potentially irreversible harm to the plaintiffs and the class of individuals they represent. The plaintiffs, therefore, seek prospective injunctive relief ordering the defendants to provide the rehabilitative services they need, and the integrated, community-based support services to which they are entitled, in accordance with federal law.

## II. JURISDICTION AND VENUE

12. This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation of rights, privileges, and immunities guaranteed by federal law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4).

13. This Court has jurisdiction over this action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2202, 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure.

14. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to these claims occurred within the Commonwealth of Massachusetts. Half of the individual plaintiffs reside in western Massachusetts.

## III. THE PARTIES

### A. *The Named Plaintiffs*

#### 1. Catherine Hutchinson

15. Catherine Hutchinson is a 54 year-old woman and mother from Attleboro who now resides at Middleboro Skilled Care Center (MSCC) in Middleboro, Massachusetts. She brings this action through her guardian, Sandy Julien, who lives at 405 Willett Avenue in Riverside, Rhode Island.

5

16. Ten years ago, Ms. Hutchinson suffered a stroke that caused bleeding in her brain stem. As a result of this acquired brain injury, she has very little movement in her arms and legs. She operates an electric wheelchair using a button and directional arrows she can manipulate with her head. Although Ms. Hutchinson is unable to speak, she can effectively communicate her thoughts and wishes. With her eyes, she can answer basic questions, utilize a letter board and operate e-mail via the internet. She has re-learned many basic skills since her injury, including how to swallow on her own and how to use a straw for drinking.

17. Ms. Hutchinson receives no ongoing, rehabilitative services, despite a medical need for these services in order to maintain her physical well-being and prevent further deterioration of her medical condition. What restorative treatment she does receive is limited in nature.

18. Ms. Hutchinson has been a resident of the nursing facility for more than nine years. She has long expressed her desire to return home with community support services, and to be closer to her family and friends. Her social worker and treatment professionals agree that she could live in a less restrictive setting with the appropriate services in place. Ms. Hutchinson describes herself as trapped, a prisoner of her disability and of the nursing facility that leaves her isolated from the life she used to know.

19. Because Ms. Hutchinson's disability resulted from a medical event, rather than an accident, she is considered to have an "acquired" brain injury, rather than a traumatic brain injury. As a result of this arbitrary distinction she, and many class members like her, are denied access to the only brain injury services offered by the defendants. Ms. Hutchinson is a remarkable and intelligent woman who uses her time and energy to advocate on behalf of people with similar disabilities. She would benefit from access to community-based services, but is

forced to remain in an overly restrictive nursing facility due to the defendants' discriminatory administration of their long term care system.

### 2. Raymond Puchalski

20. Raymond Puchalski, ("Ray") is a 58 year-old man from Millers Falls who now resides in Kindred/Goddard Hospital's neurobehavioral unit in Stoughton, Massachusetts. Mr. Puchalski brings this action through his guardian, Nickie Chandler, who lives at 165 Old Bay Road in Belchertown, MA.

21. Four years ago, Mr. Puchalski's car was struck by a driver who fell asleep at the wheel. Mr. Puchalski was in a coma for four weeks following the accident and was not expected to survive. Following the acute phase of his treatment, he spent eighteen months in a nursing facility with little specialized treatment. In order to secure more appropriate care, his partner and guardian was again forced to place him in an institutional setting, one far from his home in western Massachusetts.

22. In the two years since his admission, Mr. Puchalski has made significant progress. He can ambulate and feed himself independently. He has also learned to shower on his own with cues. Although he has had significant difficulty with both expressive and receptive language communication, his communication skills are also showing signs of improvement.

23. Social work staff and Mr. Puchalskis treatment professionals agree that he could be discharged to a small, supervised community residence with appropriate support, but there is no community setting available for him. He longs to have more freedom, to spend time outdoors and with family, and to return to his home in Millers Falls, the only place he ever wanted to live. These goals seem remote, however, and his unnecessary institutionalization likely to continue, given the lack of appropriate community support services made available by the defendants.

### 3. Glen Jones

24. Glen Jones is a 57 year-old man from Haverhill who currently resides at the Worcester Skilled Care Center (WSCC) in Worcester, Massachusetts. He brings this action through his guardian, Steven Jones, who lives at 51 Kent Street in Haverhill, Massachusetts.

25. Mr. Jones worked as an auto mechanic and owned his own business prior to the accident that changed his life. In 1986, he sustained an open head injury following a motor vehicle crash and spent three weeks in a coma. After receiving rehabilitative treatment in two area facilities, he was discharged to WSCC in 1990.

26. Mr. Jones has spent the past 21 years of his life in institutional settings. He has chafed against the limitations of these environments, longing for a return to meaningful employment and the life of independence he used to know. Following his injury, his family applied to the one state-funded program for persons with traumatic brain injury, but never received the services necessary to facilitate his discharge to the community. Efforts to identify existing residential programs were unsuccessful.

27. Mr. Jones is articulate, mobile and motivated to resume his former life. He has the continuing support of family, and hopes to return to the Haverhill area where his brother and mother reside. Mr. Jones' treatment professionals agree that he could benefit from more integrated community support services, if those services existed. In their absence, he has been forced to spend decades of his adult life isolated from the community, living apart from family and friends, and unnecessarily confined in an institutional setting.

### 4. Nathaniel Wilson

28. Nathaniel Wilson is a 54 year old man from Springfield who currently resides at the Wingate of Wilbraham skilled nursing facility in Wilbraham, Massachusetts. He brings this

action on his own behalf.

29.  A former machinist, Mr. Wilson began experiencing physical limitations approximately ten years ago that affected his ability to work. He struggled to secure section 8 housing and to survive on disability benefits. In April of 2006, he experienced a stroke that damaged the right side of his brain. This acquired brain injury primarily impacted the left side of his body, affecting his speech, mobility, facial muscles and hand.

30  Despite significant progress in the early phase of his rehabilitation, Mr. Wilson still suffers from chronic and debilitating pain in the left side of his body. However, he can ambulate with a walker and is able to communicate clearly.

31.  Mr. Wilson has limited opportunities to leave the nursing facility. A brother provides his only regular access to the community, transporting him to volunteer at an area church each week. Otherwise, a chair outside the nursing facility entrance is his only exposure to the outside world.

32.  Mr. Wilson has little in common with the facility's older residents, and he longs for the autonomy and privacy of his former life. He is able to independently perform most activities of daily living and has no hands-on nursing needs. He has received only short-term rehabilitative services at Wingate. He would benefit from the opportunity to live in an integrated community setting and to participate in more community-based programs. He needs ongoing physical therapy to support these community integration goals.

33.  Mr. Wilson seeks to leave the facility and to live as independently as possible in the community. His social worker and treatment professionals agree that he could function in the community with supervision and support, and believe he would be happier living in a less

9

restrictive setting with people his own age. However, a lack of appropriate community-based services has prevented his discharge.

34. Since Mr. Wilson's disability resulted from a medical event, rather than an external accident, he is considered to have an "acquired" brain injury. As a result of this arbitrary distinction, Mr. Wilson, and many class members like him, are denied access to the only brain injury services offered by the defendants. Mr. Wilson would benefit from access to integrated, community-based services, but is forced to remain in an overly restrictive nursing home setting due to the discriminatory nature of the defendants' service system.

### B.   *The Organizational Plaintiff*

35. The Brain Injury Association of Massachusetts ("BIAMA") is a statewide, nonprofit advocacy organization comprised of, and operated by, persons with brain injuries, their families and friends, and other medical professionals.

36. BIAMA is dedicated to ensuring that all citizens with brain injuries in the Commonwealth are afforded appropriate services and supports in the most integrated, home-like setting possible, and that these individuals and their families have meaningful choices about the nature and location of those services. Over the course of its 25-year history, BIAMA has listened to, and sought to magnify the voices of, those living with brain injury, particularly those who, because of a lack of appropriate services, find themselves segregated in institutional settings or at risk of institutional placement. As an organization, BIAMA has advocated for enhancement of government services for persons with brain injuries, and particularly for the expansion of community support services. It also has monitored the actions of the defendants in order to ensure that such services are made available. It has expended considerable organizational resources attempting to expand community services and supports for persons with

brain injuries. Despite these committed efforts, BIAMA has been unable to achieve the improvements necessary to redress the ongoing civil rights violations experienced by its members and alleged within this Complaint.

37. BIAMA is a membership organization that includes individuals with both acquired and traumatic brain injury who reside in nursing facilities. In addition to its organizational interest in expanding community settings and supports, BIAMA has many members who are also members of the plaintiff class and who are directly harmed by the actions and inactions of the defendants.

### C. *The Plaintiff Class*

38. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, the named plaintiffs bring this matter as a class action on behalf of Massachusetts residents who now, or at any time during this litigation: (1) are Medicaid eligible; (2) have suffered a brain injury; (3) reside in a nursing or rehabilitation facility or are eligible for admission to such a facility; and (4) would benefit from community support services. The proposed class excludes nursing facility residents who are class members in a related case, *Rolland v. Cellucci,* 191 F.R.D. 3 (D. Mass. 2000).

39. The plaintiff class is so numerous and geographically diverse that joinder of all members is impracticable. It is estimated that, at any given time, the plaintiff class exceeds at least several thousand individuals.

40. There are questions of law and fact common to the plaintiff class including, *inter alia:*

(1) whether defendants are violating the ADA and Section 504 by: i) failing to provide community support services to nursing or rehabilitation facility residents who

have brain injuries in the most integrated setting appropriate to their needs; ii) failing to develop a comprehensive and effectively working plan for achieving this goal; iii) utilizing methods of administration that do not allow for community placements to occur at a reasonable pace; iv) requiring persons with brain injuries to be admitted to and remain in nursing and rehabilitation facilities due to a lack of appropriate community support services; v) unlawfully discriminating against persons with acquired brain injuries; and vi) unlawfully discriminating against persons with brain injuries based on the severity of their disabilities; and

(2) whether defendants are in violation of the federal Medicaid program by: i) failing to provide necessary rehabilitative services with reasonable promptness; ii) failing to provide nursing or rehabilitation facility residents with brain injuries with adequate notice of, assessment for, and access to community support services; and iii) denying persons with brain injuries a choice between an institutionalized nursing or rehabilitation facility and integrated community waiver services by failing to inform them of these alternatives, failing to provide them with relevant information necessary to exercise this choice, and failing to afford them meaningful access to community waiver services.

41. As a result of the defendants' actions and inactions, the named plaintiffs have been denied access to the rehabilitative and community support services needed to avoid unnecessary segregation and the devastating effects of prolonged institutionalization. These claims are typical of the plaintiff class, allowing the named plaintiffs to adequately and fairly represent the federal rights and interests of class members. The individual plaintiffs will fully and vigorously prosecute this action, understanding that many class members are unable to pursue their individual rights, or to remedy these systemic violations, on their own. The

plaintiffs seek certification of a class pursuant to Fed. R. Civ. P. 23(b)(2) on the grounds that the defendants' policies, practices, and procedures are unlawful, discriminatory, and perpetuate an ongoing harm against similarly situated individuals with serious brain injuries, thereby making injunctive and declaratory relief appropriate with respect to the entire plaintiff class.

42. The named plaintiffs seek relief that will inure to the benefit of the plaintiff class as a whole. The plaintiffs are represented by attorneys experienced in federal class action litigation, disability law and public assistance benefits, including the Massachusetts Medicaid program.

### D.     *The Defendants*

43. Deval L. Patrick, Governor of Massachusetts, is the Chief Executive Officer of the Commonwealth. He oversees the various executive departments of state government including the multiple secretariats and agencies responsible for the care and treatment of individuals with disabilities and specifically persons with brain injuries, including the Executive Office of Health and Human Services (EOHHS) and the Executive Office of Administration and Finance (EOAF). He appoints the heads of these secretariats and approves the appointment of Commissioners responsible for the operation of state departments and agencies that manage and fund health and disability services, including the director of the Office of Medicaid (MassHealth) and the Commissioner of the Massachusetts Rehabilitative Commission (MRC). He also is responsible for seeking funds from the legislature to implement the Medicaid program. He is sued in his official capacity.

44. JudyAnn Bigby, Secretary of EOHHS, is responsible for the oversight, supervision, and control of the health and human services departments within the Executive Office, which includes the agencies responsible for providing, funding, or arranging community-based services for individuals with disabilities, and specifically MassHealth and MRC. Secretary

13

Bigby is responsible for ensuring that persons with disabilities are cared for, treated, and supported as required by law, and for coordinating and monitoring the agencies within EOHHS that are assigned to fulfill this duty. EOHHS is also the single state Medicaid agency for the Commonwealth pursuant to 42 U.S.C. § 1396a(a)(5). As such, Secretary Bigby is responsible for ensuring that the defendants' Medicaid programs, including their long-term care program, their nursing facility program, and their Home and Community-Based Services waiver program are operated in a manner consistent with federal requirements. She is sued in her official capacity.

45. Leslie Kirwan, Secretary of EOAF, is responsible for seeking and approving the expenditure of adequate funds from the legislature to comply with the requirements of the Medicaid program and the provision of integrated community services consistent with federal law. She is sued in her official capacity.

46. Thomas Denher, Acting Director of MassHealth and the Office of Medicaid, is responsible for the day-to-day operations of the Massachusetts Medicaid program. He oversees the development and execution of the defendants' Medicaid plan, all Medicaid policies, procedures, contracts, and practices, including those regarding services for persons with brain injuries. He is sued in his official capacity.

47. Elmer C. Bartels, Commissioner of the Massachusetts Rehabilitation Commission ("MRC"), is responsible for directing his agency's efforts to promote employment and independent living for persons with disabilities. Commissioner Bartels oversees MRC's Vocational Rehabilitation Services, Community Services, and Federal Eligibility Determinations divisions. The Brain Injury and Statewide Specialized Community Services Program (BISSCS) is part of the Community Services Division of MRC. Formerly identified as the

Statewide Head Injury Program (SHIP), BISSCS is the only state program devoted to serving persons with traumatic brain injury. MassHealth has designated BISSCS as the entity responsible for applications to and screening of candidates for the defendants' Traumatic Brain Injury Waiver. Commissioner Bartels is sued in his official capacity.

48. In light of the duties of all state defendants as set forth above, the Governor, the Secretaries of EOHHS and EOAF, the Commissioner of MRC and the Director of MassHealth are necessary for effective relief in this case.

## IV.  FACTUAL ALLEGATIONS

### A.  *Individuals with Brain Injuries*

49. Brain injuries vary in origin and effect. When brain injuries are caused by internal medical events such as stroke, loss of oxygen (anoxia), poisoning (toxemia) or brain tumors, they are referred to as acquired brain injuries (ABI). If they are caused by external events, like falls, auto accidents or other head wounds, they are part of a subset of acquired brain injuries called traumatic brain injuries (TBI). Both types of brain injuries can result in a similar disabling conditions that severely limit functioning, basic skills, and cognitive processing. These injuries also necessitate very similar community-based supports for affected individuals.

50. Brain injury can cause a wide range of functional changes that negatively affect an individual's basic life skills including movement, memory, thinking, learning, sensation, communication, and behavior. It can also increase a person's risk for a variety of medical conditions and other brain disorders including Alzheimer's and Parkinson's diseases.

51. The Center for Disease Control estimates that there are currently 5.3 million individuals -- or more than two percent of the U.S. population -- living with a long-term disability resulting from traumatic brain injury. When considering an individual's family and

15

circles of support, brain injury touches the lives of approximately one in ten persons in the United States. Of the 1.4 million traumatic brain injuries every year, 50,000 result in deaths, 235,000 in hospitalization, and 1.1 million in emergency room visits.

52. Acquired brain injuries occur with equally staggering prevalence. For example, approximately 700,000 Americans each year suffer a new or recurrent stroke, resulting in the death of 157,000 citizens annually.

53. Massachusetts' experience with brain injury mirrors that of the Nation. In 2004, there were 486 traumatic brain injury-related deaths among Massachusetts residents. In fiscal year 2004, there were 4,994 inpatient hospitalizations associated with non-fatal traumatic brain injuries. Approximately 1,750 individuals with brain injuries – more than thirty-five percent of those hospitalized – were discharged to a nursing or rehabilitation facility in 2004.

54. Individuals who survive serious brain injuries are likely to need hospitalization and intensive rehabilitation during the initial phase of their care and treatment. However, many individuals can subsequently reside in more integrated community settings with appropriate supports. Of the estimated 8,200 individuals with brain injuries currently in nursing and rehabilitation facilities across the Commonwealth, at least a quarter could transition to integrated community settings if appropriate services were available. Hundreds more who currently live in the community are eligible for, and at risk of, institutionalization because of the lack of adequate community services.

55. While individual needs may vary widely, most persons recovering from serious brain injuries require some level of assistance with personal care and activities of daily living, ongoing speech, occupational and physical therapies, medical and nursing services, vocational

training or day habilitation programs, durable medical equipment, transportation, and integrated social and recreational activities. Many also require accessible living arrangements.

56. All these services are available to some degree in the community, and most are covered by Medicaid. However, there is simply an insufficient capacity and intensity of supports to meet the needs of nursing facility residents and others who no longer require institutional care for their brain injuries. For these individuals, the denial of access to community-based support services has profound consequences. The majority of individuals who sustain moderate or severe brain injuries experience significant medical, physical, behavioral, and cognitive problems. These conditions are exacerbated by prolonged and unnecessary institutionalization, leading to deterioration in individuals' functional independence and daily living skills, severe limitations on their community access, and negative outcomes for their social/vocational development and emotional well-being.

### B. *The Requirements of the Americans with Disabilities Act and Section 504 of The Rehabilitation Act*

1. Nondiscrimination and the Integration Mandate

57. In 1990, Congress enacted the ADA, 42 U.S.C. §§ 12101 – 12181, to advance the civil rights of people with disabilities. The ADA's purpose and goal is "the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In enacting the ADA, Congress stated that, "Historically, society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination "continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress further determined that "The Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic sufficiency for such individuals." 42 U.S.C. § 12101(a)(8).

17

58. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II prohibits unnecessary segregation and institutionalization. 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of the qualified individual with disabilities"). As the Supreme Court stated in *Olmstead,* "unjustified institutional isolation of persons with disabilities is a form of discrimination" because "[i]n order to receive needed medical services, persons with mental disabilities, because of those disabilities, relinquish participation in community life...." 527 U.S. at 600-601.

59. Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a) *et seq*. Section 504's accompanying regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

2. Methods of Administration

60. Both the ADA and Section 504 of the Rehabilitation Act prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary institutionalization. 28 C.F.R. § 35.130(b)(3); § 41.51(b)(3); 45 C.F.R. § 84.4(b)(4).

61. Section 504 regulations specifically prohibit recipients of federal financial assistance from "utiliz[ing] criteria or methods of administration ... (i) [t]hat have the effect of subjecting handicapped persons to discrimination on the basis of handicap; [or] (ii) that have the

18

purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons." 28 C.F.R. § 41.51(b)(3).

### C. *The Mandates of the Medicaid Program*

#### 1. The Federal Medicaid program

62. The Medicaid program, authorized and regulated pursuant to Title XIX of the Social Security Act, is a joint federal-state medical assistance program for low-income persons. *See* 42 U.S.C. § 1396a *et seq.* One of the purposes of the Medicaid program is to provide "services to help such families and individuals attain or retain capability for independence or self-care." *Id.* At the federal level, the Medicaid program is administered by the U.S. Department of Health and Human Services' Center for Medicaid and Medicare Services ("CMS").

63. States are not required to participate in Medicaid, but once a State agrees to participate, it must comply with the requirements imposed by the Act and the regulations promulgated by the Secretary of Health and Human Services. The services that the State must provide, as well as the services they elect to provide, are described in the State plan, which is approved by the Secretary.

64. States are reimbursed by the federal government for a portion of the cost of providing Medicaid benefits. Massachusetts receives approximately fifty cents in federal reimbursement for every dollar it spends on Medicaid services.

65. Pursuant to Section 1915 of the Social Security Act, the Secretary may waive certain requirements of the Act and provide that an approved State plan include as medical assistance payment for the cost of Home and Community-Based Services (HCBS). 42 U.S.C. § 1396n. Although States must apply for a specific number of persons to be served by a HCBS

waiver, there is no limit to how many persons may be included on a waiver. Historically, States have routinely requested, and the federal government has regularly approved, incremental increases in the number of persons included in a waiver. In fact, the federal government has informed States that a limit on the number of persons served by a waiver, or the lack of sufficient waiver capacity, does not excuse States from complying with other federal laws, including the ADA's integration mandate.

66. HCBS are provided to individuals pursuant to a written plan of care, following a determination that, but for the provision of such services, the individual would require the level of care provided in a nursing facility. 42 U.S.C. § 1396n(c)(1). If a State chooses to offer a HCBS waiver program, it must inform eligible individuals about any feasible alternatives available under the waiver, and give those individuals the choice of either institutional or home and community-based services. 42 U.S.C. § 1396n(c)(2)(C); 42 C.F.R. § 441.302(d).

67. A State's HCBS waiver program must also assess whether potential home and community-based service recipients need inpatient hospital services, nursing facility services or services in an intermediate care facility. 42 U.S.C. § 1396n(c)(2)(B).

68. A core provision of the Medicaid Act requires that States provide Medicaid benefits to all eligible individuals with reasonable promptness and for as long as medically necessary. 42 U.S.C. § 1396a(a)(8); 42. U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 435.930(a).

2. The Massachusetts Medicaid program

69. Massachusetts has chosen to participate in the Medicaid program. EOHHS is the single state agency that administers the Massachusetts Medicaid program. M.G.L. c. 118E §1.

70. As required by the Medicaid Act, Massachusetts has prepared a State plan that the Department of Health and Human Services has approved. That plan, along with relevant federal