# United States Court of Appeals
## For the First Circuit

No. 10-1268

CATHERINE HUTCHINSON, BY HER GUARDIAN, SANDY JULIEN, ET AL.,

Plaintiffs, Appellees,

v.

DEVAL L. PATRICK, IN HIS OFFICIAL CAPACITY AS GOVERNOR
OF THE COMMONWEALTH OF MASSACHUSETTS, ET AL.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

Jennifer Grace Miller, Assistant Attorney General, with whom
Martha Coakley, Attorney General, was on brief, for appellants.
Steven J. Schwartz, with whom Kathryn Rucker, J. Paterson Rae,
Center for Public Representation, Richard A. Johnston, Michael R.
Dube and WilmerHale were on brief, for appellees.
Jeffrey S. Follett, Brian P. Bialas, and Foley Hoag LLP on
brief for AARP, Center for Law and Education, Inc., Lawyers'
Committee for Civil Rights Under Law, National Consumer Law Center,
Inc., National Health Law Program, Inc., Public Citizen, Inc., The
Judge David L. Bazelon Center for Mental Health Law, National
Disability Rights Network, Inc., Public Justice, P.C., Women's Bar
Association of Massachusetts, Massachusetts Law Reform Institute,
Inc., ARC Massachusetts, Inc., American Civil Liberties Union

Foundation of Massachusetts, Disabilities Rights Center, Inc.,
Disability Law Center, Inc., Disability Rights Center, Greater
Boston Legal Services, Inc., Legal Assistance Corporation of
Central Massachusetts, Rhode Island Disability Law Center, Inc.,
South Coastal Counties Legal Services, Inc., and Western
Massachusetts Legal Services, Inc., amici curiae.

———————————————

February 17, 2011

———————————————

**SELYA**, **Circuit Judge**.   This appeal requires us to consider the circumstances under which a litigant who obtains significant relief through a court-approved settlement, rather than a verdict or a formal consent decree, may achieve "prevailing party" status and, thus, become eligible for an award of attorneys' fees under a typical federal fee-shifting statute.   The appeal also requires us to consider when, short of the entry of a final judgment, "prevailing party" status may attach.

These questions (and the other questions before us) arise in the following setting.   After the parties reached a negotiated settlement resolving the substance of a complicated class action, the district court awarded the plaintiffs attorneys' fees and expenses totaling over three-quarters of a million dollars.   The defendants appeal, asseverating that the district court improperly characterized the plaintiffs as prevailing parties; acted prematurely in arriving at that conclusion; and to add insult to injury, set the amount of the award too generously.   We conclude that the district court appropriately characterized the plaintiffs as prevailing parties, that the relief obtained was sufficiently final to justify a fee award, and that the court acted within the purview of its discretion in fixing the amount.   Consequently, we affirm.

## I.  BACKGROUND

On May 17, 2007, the named plaintiffs — several individuals with acquired brain injuries who qualify for long-term care services under the Medicaid program and two organizations devoted to their cause (the Brain Injury Association of Massachusetts and the Stavros Center for Independent Living) — filed suit to compel the defendants — various officials of the Commonwealth of Massachusetts (collectively, the Commonwealth) — to comply with Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12165, section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and the reasonable promptness provision of the Medicaid program as set forth in the Social Security Act, 42 U.S.C. § 1396a(a)(8), (a)(10)(A), by offering services and programs for individuals with acquired brain injuries in integrated community settings.  The Commonwealth filed an answering motion, which triggered a spate of motion practice.

On July 13, 2007, the plaintiffs moved for class certification.  They then served an array of discovery requests. The Commonwealth cross-moved to stay discovery pending a decision on class certification.  The district court granted a stay.

On September 26, 2007, the court certified a class. Shortly thereafter, the parties began settlement negotiations in earnest and agreed to suspend discovery while negotiations proceeded.  The talks proved fruitful and, on May 30, 2008, the

parties executed a settlement agreement (the Agreement) that they described as "final" and "comprehensive."

In terms, the Agreement required the Commonwealth, over a period of years, to expand community services (residential and non-residential) for Medicaid-eligible individuals with acquired brain injuries.  To this end, the Commonwealth is charged with developing several new projects and programs.  The Commonwealth's responsibilities are, however, subject to its ability to secure both funding from the state legislature and necessary approvals from the federal government.  With respect to these matters, the Agreement impresses an obligation on the Commonwealth to use best efforts.  If the Commonwealth is unable to obtain funding or approvals and the Agreement stalls, either side may move to vacate the settlement so that the plaintiffs can litigate the case.

The Agreement contemplates that the case will remain open for a period of years while the Commonwealth performs thereunder; it authorizes dismissal of the action only after the Commonwealth has completed certain specified obligations and is found to be in "substantial compliance" with the Agreement's terms.  The Agreement further provides that the district court "shall retain jurisdiction to hear and adjudicate noncompliance motions."

Because the district court had certified a class, the Agreement required judicial approval.  <u>See</u> Fed. R. Civ. P. 23(e). The parties jointly moved for this approval and, after a

preliminary fairness hearing, the district court allowed the approval process to move forward. The court acknowledged, at the Commonwealth's urging, that the Agreement memorialized a settlement and was not tendered as a consent decree.

After the class members were notified of the proposed settlement, see Fed. R. Civ. P. 23(e)(1), the district court held a final fairness hearing. The court again noted that the Agreement "does not constitute a consent decree but is a settlement agreement of this disputed case." The plaintiffs suggested that the court approve the Agreement by entering it as a court order, but the Commonwealth objected. The court expressed its willingness to indicate, either orally or through a written order, its finding that the Agreement represented a fair and appropriate resolution of the matter. It then asked the parties to submit a draft of a proposed order for approval of the Agreement.

On July 29, 2008, each side submitted a proposed order. The parties disagreed as to whether the court needed explicitly to retain jurisdiction as a means of facilitating subsequent enforcement of the Agreement. In an effort to achieve a meeting of the minds, the district court suggested the following language:

> [T]he court approves the comprehensive settlement agreement. This case will not be closed and judgment will not enter pending compliance with the terms of the settlement agreement.

This suggestion did not please anyone.  The plaintiffs feared that, without language explicitly retaining enforcement jurisdiction, the court's authority might be questioned in the event that further compliance proceedings become necessary.  For its part, the Commonwealth expressed concern that the court's words might be transformed into the functional equivalent of a consent decree. The Commonwealth noted that, in the course of settlement negotiations, it had consistently maintained its unwillingness to resolve the case by means of "a document that could be functionally a consent decree."

Faced with this impasse, the district court took the matter under advisement.  On September 18, 2008, the court, acting without further input from the parties, entered a final approval order.  The order states in pertinent part:

> [T]he court finds that the Comprehensive Settlement Agreement is fair, reasonable, and adequate.  Therefore, the court approves the Comprehensive Settlement Agreement, noting that the parties agree that this agreement does not constitute a consent decree, and that the court will retain jurisdiction over the case.  The court orders that this case not be closed and that judgment not enter pending compliance with the terms of the Comprehensive Settlement Agreement.

The entry of the approval order set the stage for the developments leading to this appeal.  The plaintiffs, claiming to be prevailing parties, moved for an award of attorneys' fees

(including costs) in the amount of $786,123.[1]   The Commonwealth disputed the "prevailing party" characterization, the timing of the motion for fees, and the reasonableness of the requested award. The district court found that the plaintiffs were prevailing parties, that fees were presently allowable, and that the amount sought was "eminently fair."    Accordingly, it awarded the plaintiffs the full amount sought.   This timely appeal followed.

## II.  ANALYSIS

The Commonwealth prosecutes this appeal on three fronts. First it asserts that the plaintiffs are not prevailing parties and that, therefore, they are not entitled to a fee award.  Second, it questions the timing of the plaintiffs' quest for fees.   Its fallback position is that, even if we find its first two points unconvincing, the district court nevertheless committed an abuse of discretion in determining the size of the award.  We consider these assertions sequentially.

### A.  <u>Prevailing Party Status</u>.

We review a determination of "prevailing party" status de novo.  <u>Aronov</u> v. <u>Napolitano</u>, 562 F.3d 84, 88 (1st Cir. 2009) (en banc); <u>Smith</u> v. <u>Fitchburg Pub. Sch.</u>, 401 F.3d 16, 21 (1st Cir.

---

[1] The plaintiffs' motion was, by its terms, brought "pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205."  The language of these two fee-shifting provisions is virtually identical in all material respects.   Following the lead of the parties and the district court, we treat the ADA's fee-shifting provision, 42 U.S.C. § 12205, as the operative statute.

-8-

2005).   Fee-shifting statutes represent a departure from the historic American rule, which dictates that parties to a case normally will bear their own counsel fees and costs.   See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). When, as in this case, the application of such a statute cuts through the government's traditional sovereign immunity, it "must be construed strictly in favor of the government."   Aronov, 562 F.3d at 88 (citing Ardestani v. INS, 502 U.S. 129, 137 (1991)).

The text of the ADA's fee-shifting provision reads in its entirety:

> In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.

42 U.S.C. § 12205.   When used in a federal fee-shifting statute, "the term 'prevailing party' [is] a legal term of art."   Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 603 (2001).   The concepts that shape the term apply broadly to the entire universe of federal fee-shifting statutes.[2] See Smith, 401 F.3d at 22 n.8; Doe v. Boston Pub. Sch., 358 F.3d 20, 25 (1st Cir. 2004).

---

[2] In any event, the key precedent is Buckhannon, and the Court there dealt in part, as we do here, with the ADA's fee-shifting provision, 42 U.S.C. § 12205.   See Buckhannon, 532 U.S. at 601.

To qualify as a prevailing party, a litigant must show that a material alteration of the parties' legal relationship has taken place as a result of the litigation.  <u>Tex. State Teachers Ass'n</u> v. <u>Garland Indep. Sch. Dist.</u>, 489 U.S. 782, 792-93 (1989). In addition, a party must demonstrate that the alteration possesses a "judicial <u>imprimatur</u>."  <u>Buckhannon</u>, 532 U.S. at 605 (emphasis in original).  We need only discuss the second of these requirements here, as the Commonwealth asserts that the "plaintiffs have failed to satisfy the judicial imprimatur requirement."

The <u>Buckhannon</u> Court identified only two situations in which this judicial imprimatur requirement would necessarily be satisfied: where the plaintiff "received a judgment on the merits" or where she "obtained a court-ordered consent decree."  <u>Id.</u>  The Justices left open the question of whether (and if so, under what circumstances) a court-approved settlement that is not embodied in a formal consent decree may serve as the gateway to "prevailing party" status.  The case at hand requires us to ponder this question.

We do not write on a pristine page: our recent en banc opinion in <u>Aronov</u> provides guidance.  There, we indicated that an order short of a formal consent decree might be sufficient for this purpose.  562 F.3d at 90.  We emphasized, however, that this inquiry must focus on substance, not form.  It follows that it is the function of the order that carries the most weight in

determining whether it may serve as the linchpin for "prevailing party" status.  See id. (explaining that "it is the reality, not the nomenclature which is at issue"); see also id. at 90 n.7 (collecting cases from other circuits reaching the same conclusion).  Thus, rather than look exclusively at the label attached to a particular order, an inquiring court must consider "whether the order contains the sort of judicial involvement and actions inherent in a 'court ordered consent decree.'"  Id. at 90.

The Commonwealth argues that Aronov directs us to ignore the Agreement itself and look exclusively at the approval order when mulling whether the order contains elements inherent in a conventional consent decree.  That is too crabbed a reading of Aronov.  Indeed, such a myopic approach would be at odds with Aronov's instruction that "[w]hether an order contains a sufficient judicial imprimatur can only be determined by determining the content of the order against the entire context before the court."  Id. at 92 (emphasis supplied); cf. Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 279 (4th Cir. 2002) (examining whether agreement and dismissal order "were, in combination, equivalent to a consent decree").  We thus construe the approval order in light of both the content of the Agreement itself and its entire context.

Our inquiry looks to three factors.  The first factor is whether the change in the legal relationship between the parties was "court-ordered."  Aronov, 562 F.3d at 90 (quoting Buckhannon,

532 U.S. at 604).  The second factor is whether there was "judicial approval of the relief vis-à-vis the merits of the case."  Id.  The third factor is whether there exists continuing "judicial oversight and ability to enforce the obligations imposed on the parties."  Id.  We start with a determination of whether the change in legal relationship is court-ordered.

The Agreement itself specifically provides that, in the absence of court approval, "the Agreement shall be null and void and of no force and effect."  Hence, it is the approval order that makes the provisions of the Agreement binding on the parties and gives bite to their reciprocal obligations.  In other words, this is a situation in which the court order triggers the change in the relationship between the parties, not one in which "the court merely recognizes what the government has voluntarily agreed to do and only 'requir[es] [the government] to follow through.'"  Id. at 93 (alterations in original) (quoting Smith, 401 F.3d at 27).  Given this reality, we find that the court's involvement is sufficient to satisfy the first prong of the inquiry.

The second prong of the inquiry requires us to determine whether there has been "judicial approval of the relief vis-à-vis the merits of the case."  Id. at 90.  Under the Civil Rules, a court must approve a settlement in a class action and is directed to do so only if it finds the terms of the settlement "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); see Nat'l

<u>Ass'n of Chain Drug Stores</u> v. <u>New Engl. Carpenters Health Benefits</u>
<u>Fund</u>, 582 F.3d 30, 44 (1st Cir. 2009).  This is strikingly similar
to a court's role in entering a consent decree — a role that
requires a court to ensure that the terms of the proposed decree
"are fair and not unlawful."  <u>Smyth</u>, 282 F.3d at 280.

        This background informs the meaning of the phrase
"appraisal of the merits" in the "prevailing party" context.  On the
facts here, the district court, while evaluating the fairness of the
settlement under Rule 23(e)(2), engaged in a sufficient appraisal
of the merits for purposes of the imprimatur requirement.

        In the process of approving the Agreement, the court
complied fully with the requirements of Rule 23(e)(2).  It held
multiple hearings during which it displayed its familiarity with the
terms of the Agreement.  At the hearing held on July 25, 2008, the
court expressed its satisfaction that the interests of the plaintiff
class had been adequately considered.  The court's extended
engagement with the substance of the Agreement easily distinguishes
this case from the virtually nonexistent review conducted in <u>Aronov</u>,
562 F.3d at 87, where the district court merely entered an
electronic docket entry granting the agreed motion to remand.  For
these reasons, we conclude that a sufficient appraisal of the merits
occurred.

        This leaves the third prong of the inquiry, in which we
ask whether there exists "an obligation to comply and the provision

of judicial oversight to enforce that obligation." <u>Id.</u> at 91 (citing <u>Smyth</u>, 282 F.3d at 279-81); <u>see</u> <u>Petersen</u> v. <u>Gibson</u>, 372 F.3d 862, 866-67 (7th Cir. 2004) (holding that "a settlement short of a consent decree may qualify [as a basis for prevailing party status] if . . . the order provided that the court would retain jurisdiction to enforce the terms of the settlement").

In the approval order, the district court expressly retained jurisdiction over the case. This fits tongue and groove with the terms of the Agreement, which makes pellucid the parties' shared desire that the court "retain jurisdiction to hear and adjudicate noncompliance motions" on a going-forward basis. Finally, the approval order instructs that the "case not be closed and that judgment not enter pending compliance with the terms of" the Agreement. These features distinguish the case at hand from the swath of cases in which a district court merely recognizes the fact of a settlement and dismisses the underlying action. <u>See</u>, <u>e.g.</u>, <u>Smith</u>, 401 F.3d at 21; <u>see</u> <u>also</u> <u>Buckhannon</u>, 532 U.S. at 604 n.7 (noting that federal jurisdiction to enforce private settlements within the structure of the original case is lacking unless the terms of the settlement "are incorporated in the order of dismissal").

Here, moreover, the terms of the Agreement explain in some detail the parameters of the district court's enforcement authority. If the parties are unable to resolve compliance issues on their own,

the plaintiffs may ask the court to determine that the Commonwealth is not living up to its obligations under the Agreement.  The court is authorized to grant equitable relief (but not to use the contempt powers) in order to achieve compliance.  If the Commonwealth fails to abide by such an order, the Agreement allows the court to "use any appropriate equitable or remedial power then available to it."  The broad enforcement authority bestowed upon the district court separates the Agreement from the mine-run of private settlements, which — though enforceable — require resort to an independent action for breach of contract.  See, e.g., Aronov, 562 F.3d at 91; Christina A. ex rel. Jennifer A. v. Bloomberg, 315 F.3d 990, 993 (8th Cir. 2003).

One other facet of the Agreement attests to the district court's ongoing role.  The Agreement is subject to modification only upon mutual written assent of the parties and with the court's concurrence.  The need for court approval of revisions in the terms of the Agreement closely resembles the process for amending a conventional consent decree.  See Aronov, 562 F.3d at 91 (discussing process for modifying consent decrees); see also Fed. R. Civ. P. 60(b)(5).  Taken together, the approval order and the Agreement itself envision an ongoing role for the district court in the dispute.  That role includes ongoing judicial oversight.  The approval order, therefore, satisfies the third prong of the inquiry.

We summarize succinctly.  Consideration of the three pertinent factors leads inexorably to the conclusion that the Agreement, though structured as a court-approved settlement rather than as a formal consent decree, bears a sufficient judicial imprimatur to qualify the plaintiffs as prevailing parties.  That qualification, in turn, renders them eligible for an award of attorneys' fees.[3]

## B.  **Timing**.

The Commonwealth maintains that any fee award is premature because (i) the "success" that the plaintiffs achieved was embodied in the Agreement and not in any court order; and (ii) in all events, the order entered by the district court — the approval order — does not constitute a final judgment.  The first of these arguments (which implicitly acknowledges that the plaintiffs have obtained some relief on the merits) is easily dispatched.  As we already have explained, the plaintiffs' success hinges on the combined effect of the Agreement and the approval order.  See supra Part II(A).  In view of that fact, it would be struthious — and plainly wrong — to attribute the relief obtained to the Agreement alone.

---

[3] We emphasize that the mere fact that a settlement is subject to court approval does not in itself supply the necessary ingredients for prevailing party status.  It is the presence of continuing judicial oversight that pushes the ball across the goal line and thus suffices to give a settlement the required judicial imprimatur.

-16-

The plaintiffs' second argument has a certain superficial allure.  After all, merely winning a battle in an ongoing case will not normally suffice to animate a federal fee-shifting statute.  See Sole v. Wyner, 551 U.S. 74, 86 (2007) (denying fees to plaintiff who was granted preliminary injunction but was denied a permanent one); Hewitt v. Helms, 482 U.S. 755, 760 (1987) (finding no prevailing party status when "[t]he most that [movant] obtained was an interlocutory ruling that his complaint should not have been dismissed for failure to state a constitutional claim"); Hanrahan v. Hampton, 446 U.S. 754, 758-59 (1980) (denying fees to plaintiffs who successfully secured vacation of a judgment against them, yielding a new trial).

This does not mean, however, that a fee award always must await full litigation of a case and the entry of a final judgment. The Supreme Court has made it transparently clear that an award under a federal fee-shifting statute may sometimes be appropriate prior to the entry of a final judgment.  Tex. State Teachers Ass'n, 489 U.S. at 791.  Such an award is proper, pendente lite, "where a party 'has established his entitlement to some relief on the merits of his claims.'"  Id. at 790 (quoting Hanrahan, 446 U.S. at 757). Thus, prevailing party status is not restricted to a party who has secured a favorable final judgment.  LaRouche v. Kezer, 20 F.3d 68, 71 (2d Cir. 1994).

-17-

The question, then, is whether the plaintiffs, at this stage, can be said to have succeeded on significant claims affording them some of the desired relief.  Like the lower court, we think that they have.

The Court has indicated that civil rights plaintiffs who obtain enforceable relief by means of a consent decree or court-approved settlement may be entitled to attorneys' fees.  Maher v. Gagne, 448 U.S. 122, 129 (1980).  "The fact that [a party] prevailed through a settlement rather than through litigation does not weaken her claim to fees."  Id.  So long as there is a judicial imprimatur on the relief obtained, fees may follow.[4]

To be sure, this leaves open a question as to whether the settlement is sufficiently final to bear the weight of a fee award.  Put another way, does it mark the achievement of a significant measure of relief on the plaintiffs' claims?  Here too the focus on function over form that we embraced in Aronov informs our

_____

[4] In Buckhannon, the Supreme Court emphasized that its earlier decision in Maher continued to stand for the proposition that a consent decree may serve as the basis for a fee award.  532 U.S. at 604.  The Court noted, however, that any suggestion that Maher allowed for the recovery of fees for private settlements was misplaced because such agreements "do not entail the judicial approval and oversight involved in consent decrees."  Id. at 604 n.7.  We think that, in light of the functional grounds on which the Buckhannon Court distinguished private settlements from consent decrees, its statement, consistent with our analysis in Aronov, suggests that Maher allows for the award of fees in the case of a settlement that does entail judicial approval and continuing judicial oversight (similar to what is involved in connection with a consent decree).

understanding of whether the timing is appropriate for a fee award. Viewed in that perspective, the question demands an affirmative answer.  See, e.g., Richardson v. Miller, 279 F.3d 1, 4 (1st Cir. 2002) (implicitly recognizing that a settlement that was functionally similar to a consent decree could serve as the basis for an award of fees).

This litigation has reached a significant plateau.  In the Agreement, the parties characterize the settlement as "final" and "comprehensive."  Moreover, the Agreement, embellished by the approval order, affords meaningful relief to the plaintiff class and bears the requisite hallmarks of judicial approbation and oversight. See supra Part II(A).  Thus, this case is unlike Wyner, Hewitt, or Hanrahan, in which the fee-seeker achieved only some fleeting success at a time when the litigation had yet to run its course. This case, while not yet closed, is not currently being litigated; it has been settled and, therefore, the litigation, as a practical matter, has drawn to a close.

The Commonwealth notes that there exists the possibility that litigation could be resumed (if, say, it is unable to secure funding and, thus, to follow through on the commitments embodied in the Agreement).  But this sort of latent uncertainty exists in virtually every case; even a final judgment can be appealed, see Fed. R. App. P. 4, or reopened in certain circumstances, see, e.g., Fed. R. Civ. P. 60(b).  Such a bare possibility does not, in and of

itself, inject a sufficient level of uncertainty to make a fee award premature.  See generally Tex. State Teachers Ass'n, 489 U.S. at 792 (explaining that, at minimum, a prevailing party "must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant" and that an insignificant "technical victory" would not suffice).

## C. **Reasonableness**.

As a fallback, the Commonwealth challenges the size of the fee award.  For this purpose, we treat case law under the Fees Act, 42 U.S.C. § 1988, and other federal fees clarifying statutes, as persuasive authority.  See Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 14 (1st Cir. 2003); New Hampshire v. Adams, 159 F.3d 680, 684 (1st Cir. 1998).

"[B]ecause determination of the extent of a reasonable fee necessarily involves a series of judgment calls, an appellate court is far more likely to defer to the trial court in reviewing fee computations than in many other situations." Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992).  Consequently, appellate review is for abuse of discretion.  Burke v. McDonald, 572 F.3d 51, 63 (1st Cir. 2009); Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001).  Within this rubric, a material error of law always constitutes an abuse of discretion.  Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008).  But apart from issues of law, "we will set aside a fee award only if it clearly

appears that the trial court ignored a factor deserving significant weight, relied upon an improper factor, or evaluated all the proper factors (and no improper ones), but made a serious mistake in weighing them." Gay Officers Action League, 247 F.3d at 292-93.

When fashioning a fee award, the district court ordinarily starts by constructing what has come to be known as the lodestar. See Perdue v. Kenny A. ex rel. Winn, 130 S. Ct. 1662, 1672 (2010). In general, the lodestar is the product of the number of hours appropriately worked times a reasonable hourly rate or rates. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Gay Officers Action League, 247 F.3d at 295. The party seeking the award has the burden of producing materials that support the request. Hensley, 461 U.S. at 433. These materials should include counsel's contemporaneous time and billing records, suitably detailed, and information anent the law firm's standard billing rates. Gay Officers Action League, 247 F.3d at 295-96. The putative payor may submit countervailing evidence. See, e.g., Foley v. City of Lowell, 948 F.2d 10, 20-21 (1st Cir. 1991). The court, usually after hearing arguments, will then "calculate[] the time counsel spent on the case, subtract[] duplicative, unproductive, or excessive hours, and . . . appl[y] prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." Gay Officers Action League, 247 F.3d at 295.

In the instant case, the plaintiffs moved for an award of fees (including expenses) in the amount of $786,123. This figure included $775,136 in fees and $10,987 in expenses. Billing rates ranged from $250/hr. to $425/hr. depending on the skill and experience of the lawyer rendering a particular service. Travel time, where separately delineated in the motion for fees, was invoiced at a flat rate of $150/hr.

The plaintiffs buttressed their motion with an array of supporting documents. In mounting its opposition to the dollar amount of the request, the Commonwealth relied mainly on argumentation, not evidence (although it did point to other, more modest awards that had been made in unrelated cases). After hearing protracted arguments, the district court awarded the plaintiffs exactly what they requested.

On appeal, the Commonwealth contests the reasonableness of this award on three grounds: (i) that it compensates the plaintiffs for unnecessary work; (ii) that the rates used in formulating the award are inordinately high; and (iii) that many of the costs and expense items claimed are not recoverable as part of a fee-shifting award. We address each of these plaints separately.

1. **Time Spent**. The Commonwealth's assault on the temporal component of the fee award rests on an assertion that the district court abused its discretion by choosing not to pare the total number of hours claimed by the plaintiffs. Specifically, the

Commonwealth insists that the plaintiffs overstaffed the case and that the district court should have carved out time spent in profligate duplication of effort and other unnecessary or unreimbursable endeavors, such as intramural conferencing, settlement negotiations prior to the commencement of the action, and travel.  We do not agree.

The Commonwealth's principal lament relates to staffing. In evaluating this plaint, we are mindful that there is no mathematically precise formula for staffing complex litigation. Each case is different, and the trial court is "uniquely positioned to weigh the parties' staffing needs, assess the reasonableness of their handling of the case, and evaluate the quality and relevance of the services rendered." Gay Officers Action League, 247 F.3d at 298.

We focus first on the plaintiffs' enlistment of a number of different lawyers, many of whom worked collectively on specific projects within the broader litigation.  Such staffing practices are not forbidden in fee-shifting cases; parties sometimes are justified in making a strategic choice to use teams of lawyers in various phases of complex litigation.  See id. at 297 (explaining that "the mere fact that more than one lawyer toils on the same general task does not necessarily constitute excessive staffing").  And where the deployment of multiple attorneys on a single project is reasonable, that staffing pattern inevitably results in a need for some amount

of coordination, including intramural conferencing.  Everything turns on the reasonableness of the staffing patterns employed and the overall time spent.  <u>See</u> <u>Torres-Rivera</u>, 524 F.3d at 336 (explaining that reasonableness in the context of time management "is largely a matter of informed judgment").

When all is said and done, staffing must be appraised on a case-by-case basis.  <u>See</u>, <u>e.g.</u>, <u>Gay Officers Action League</u>, 247 F.3d at 298.  Here, the plaintiffs accounted for a modicum of overstaffing by eliminating some time spent by two of their lawyers and completely disregarding the hours worked by some minor players before formulating their fee request.  The district court, which was intimately familiar with the demands of this unusually complicated case, found the remaining hours spent to be reasonable.  Had the Commonwealth submitted evidence opposing the request — for example, affidavits attesting that private clients would not typically consent to staffing patterns like those used by the plaintiffs in this case — the district court might have viewed the question differently.  We certainly would have.  Nor has the Commonwealth in lieu of an affidavit cited to us analogous cases in support of its contention that this case was simply overstaffed.  In the absence of such information, though the district court's assessment is one on which reasonable minds could disagree, it was not an abuse of discretion.

Much the same approach can be taken to the Commonwealth's complaint about travel time.  Travel is often a necessary incident of litigation,[5] and an attorney's travel time may be reimbursed in a fee award.  See, e.g., Maceira v. Pagan, 698 F.2d 38, 40 (1st Cir. 1983).  Although compensation for such time ordinarily is calculated at an hourly rate lower than that which applies to the attorney's substantive labors, see, e.g., id., there is no hard-and-fast rule establishing what percentage of an attorney's standard billing rate is appropriate for travel time.

Viewed against this backdrop, the Commonwealth's broadside against travel time misses the mark.  Some of the plaintiffs' lawyers charged for travel time at a reduced rate and those that did not provide a designated travel rate billed for travel time (as for their other work) at rates substantially below their customary billing rates.  All of the submissions tied the quantum of travel to work that the district court found appropriate.  The award of amounts attributable to travel time was, therefore, not an abuse of discretion.

The Commonwealth also excoriates the inclusion of time spent in performing legal work prior to the commencement of suit. "[P]re-suit fees may be awarded . . . only for 'discrete' work 'that

_____

[5] In this case, some travel was essential.  The case was pending in the western division of the District of Massachusetts, sitting in Springfield, and the plaintiffs' lawyers were based in Boston (some 90 miles away).

was both useful and of a type ordinarily necessary to advance the
. . . litigation to the stage it reached.'" Schneider v. Colegio de
Abogados de P.R., 187 F.3d 30, 33 (1st Cir. 1999) (quoting Webb v.
Bd. of Educ. of Dyer Cnty., Tenn., 471 U.S. 234, 243 (1985)); see
also Bogan v. City of Boston, 489 F.3d 417, 427 (1st Cir. 2007).
The district court found, at least implicitly, that the pre-suit
hours lodged here fall within this taxonomy.  We think that this
judgment call was within the encincture of the court's discretion.

     Having dealt with the Commonwealth's specific plaints, we
need not tarry over its global objection to the fee award.   In
conjunction with their motion for fees, the plaintiffs submitted
detailed records that itemized their work on the case over a period
of several years.  In addition, they submitted affidavits from three
of their counsel describing each lawyer's role in the litigation and
the specific contributions that he or she had made to the case.  The
plaintiffs also submitted affidavits from brain-injury experts
speaking to the significance of the relief obtained.

     The district court had the benefit of these materials.  It
(understandably) gave considerable weight to the fact that the
plaintiffs discounted the total number of hours before compiling
their fee request, electing to eschew compensation for a portion of
the time that they had worked.  As a result of this self-pruning,
the requested fee, in the district court's estimation, was actually
lower than the lodestar.  The fee award in this case was certainly

-26-

quite generous.  On this record, however, we cannot say that the district court abused its discretion in declining to reduce even further the total number of hours that the plaintiffs used as the multiplicand in the calculation of fees.

    **2.  Rates**.  The Commonwealth also challenges the rates that the plaintiffs utilized in seeking fees.  It suggests that the use of such exorbitant rates as a basis for the fee award results in a windfall.

    There is no universal market rate for legal services. Rather, "[r]easonable hourly rates will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers, and other criteria." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 38 (1st Cir. 2008); see Blum v. Stenson, 465 U.S. 886, 895 (1984).  There are, however, some generally accepted guideposts.

    One such rule of thumb is that the rate that a private lawyer actually charges to clients in the ordinary course of his practice, though not conclusive, is a useful indicator of market value.  One Star Class Sloop Sailboat, 546 F.3d at 40.  Another rule of thumb is that data evidencing the prevailing market rate for counsel of comparable skill and experience provides helpful guidance.  See Blum, 465 U.S. at 895 & n.11.  The fee-seeker must carry the burden of establishing the prevailing hourly rate (or schedule of rates) in the community for the performance of similar

legal services by comparably credentialled counsel.  <u>See</u> <u>Bordanaro</u> v. <u>McLeod</u>, 871 F.2d 1151, 1168 (1st Cir. 1989).

The rates applied and awarded in this case are amply supported.  In their motion papers, the plaintiffs sought compensation at hourly rates ranging from $250/hr. to $425/hr.  The individual lawyers fell into two groups: lawyers from the nonprofit Center for Public Interest and lawyers from the Boston office of a national law firm.

As to the former, the rates used were identical to those that the same lawyers had previously received in civil rights cases. <u>See</u>, <u>e.g.</u>, <u>Rosie D. ex rel. John D.</u> v. <u>Patrick</u>, 593 F. Supp. 2d 325, 331 (D. Mass. 2009).  Moreover, the rates were relatively modest when compared to the standard rates charged by their counterparts in private law firms.

As to the law firm, the rates charged were pretty much the same as those received by the firm in a recently concluded public interest case.  <u>See</u> <u>id.</u> at 330-31.  Those rates were in many instances substantially below the standard billing rates charged by the private attorneys.[6]  <u>See</u> <u>id.</u> at 330.

In passing upon the reasonableness of the rates, the court below considered the rates approved in <u>Rosie D.</u>, a case in which the

---

[6] For example, the standard billing rate for the most accomplished member of the law firm was $725/hr., but the plaintiffs used a rate of $425/hr. for his time in formulating their fee request.

fee award against the Commonwealth was not appealed.  The court also considered affidavits executed by an independent expert on fees and by two public interest lawyers practicing in Massachusetts.  Each of those affiants opined that the suggested rates were not only reasonable but also below the market rates for the types of work performed by the caliber of lawyers involved.

We think it is significant that, despite the ferocity of the Commonwealth's attack on the rates, it presented no evidence of a countervailing rate structure.  The Supreme Court has admonished that, where a party opposing a motion for fees fails to submit "any evidence challenging the accuracy and reasonableness" of the facts asserted in connection with a supported fee request, that failure may amount to a waiver of the right to challenge the district court's determination regarding the reasonableness of the request on appeal.  Blum, 465 U.S. at 892 n.5.  Where as here, a prevailing party submits a supported application for fees, the fee-target runs a risk if it chooses to do no more than criticize the rates requested and point to the fact that some other judge, in some other case, has embraced a different set of rates.  Foley, 948 F.2d at 21 ("The City, of course, had an opportunity to adduce evidence of a more realistic rate structure, but did not do so.  Absent any such evidence, we are hard pressed to fault the lower court for embracing the plaintiff's suggested rates.").~

To say more on this point would be to paint the lily. In light of the supporting documentation provided by the plaintiffs and the Commonwealth's failure to produce or point to contradictory evidence, we conclude that the district court did not abuse its discretion in fashioning a fee award premised on the suggested rates.

     3. **Expenses**. The Commonwealth challenges the district court's allowance of certain expenses and cost items, including charges for travel, printing, and photocopying. The Commonwealth asserts that these charges should have been disallowed because they were not "directly associated" with the litigation. This argument seems to rest largely on the notion that expenses, not recoverable as costs under 28 U.S.C. § 1920, are not independently recoverable at all but, rather, comprise a part of the lawyers' overhead.

     This assertion consists of more cry than wool. It is settled beyond peradventure that reasonable expenses, necessary for the prosecution of a case, are ancillary to and may be incorporated as part of a fee award under a prototypical federal fee-shifting statute. See Palmigiano v. Garrahy, 707 F.2d 636, 637 (1st Cir. 1983) (per curiam); see also 42 U.S.C. § 12205 (including "litigation expenses, and costs" as components of allowable fee awards). Contrary to the Commonwealth's implication, the availability of such remediation is not limited to items recoverable as court costs under section 1920. Rather, such recovery can extend

to a broad range of other items, including travel expenses, computer time, and the like.  See Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 43 (1st Cir. 2006) (explaining that "such items may be recovered where appropriate as part of attorneys' fees under the typical federal fee-shifting statute").

The Commonwealth's challenge to the amount of costs awarded for printing — an expense explicitly listed as taxable under section 1920 — is equally unavailing.  The ADA's fee-shifting provision clearly includes "costs" as part of an allowable fee award, and in combination with the express terms of section 1920, this renders the Commonwealth's bare assertion that printing costs "have been repeatedly rejected as 'unrecoverable overhead'" wholly unconvincing.

That ends this aspect of the matter.  We hold, without serious question, that reasonable costs and expenses for travel, printing, and photocopying can be recovered in a fee-shifting proceeding without regard to the limitations contained in 28 U.S.C. § 1920.  Because the Commonwealth has not contested either the fact or the amount of the expenditures targeted here, awarding reimbursement of them did not constitute an abuse of the trial court's discretion.

## III.   CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the district court's award of attorneys' fees and expenses.

**Affirmed**.