# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### Western Division

|  |  |  |
|---|---|---|
| Catherine Hutchinson, et al. | ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) | Civil Action No.  07-30084-MAP |
| Deval L. Patrick, et al. | ) ) ) | |
| Defendants. | ) ) ) | |

## JOINT MEMORANDUM IN SUPPORT OF MOTION OF DISMISSAL

Pursuant to Fed.R.Civ.P. 41(a)(2) and consistent with Fed. R. Civ. P. 23 and Paragraph 51 of the Amended Settlement Agreement, the parties have jointly moved to dismiss this action with prejudice.  This Memorandum sets forth in detail the basis for that Motion and describes the specific ways in which the Defendants have demonstrated substantial compliance with the terms of the Amended Settlement Agreement ("Amended Agreement").  Attached as Ex. A.

I.     **Background and Terms of the Amended Settlement Agreement**

This class action, commenced in 2007, was brought by two organizational plaintiffs – the Brain Injury Association of Massachusetts (BIA-MA) and the Stavros Center for Independent Living – and five individual named plaintiffs with Acquired Brain Injuries (ABI) who, at the time, were residents of various nursing facilities in Massachusetts.  In their action, the Plaintiffs raised claims under the Americans with Disabilities Act, the Rehabilitation Act, and Title XIX of the Social Security Act, asserting that they were entitled to, among other things, the opportunity to receive integrated services in the community as an alternative to receiving services in a

nursing facility.  After the Court certified a class[1] in October of 2007, the parties entered into settlement negotiations.  These negotiations resulted in a Settlement Agreement that was approved by the Court on September 18, 2008.  Attached at Ex. B.

As part of the Settlement Agreement, the Commonwealth committed to expand its home and community-based service system for persons with ABI.  In the years that followed, it designed and implemented two Medicaid-funded Home and Community-Based Services (HCBS) waivers for persons with ABI who are in nursing and long-term care rehabilitation facilities ("Class Members").  These waivers created opportunities for transition from nursing and rehabilitation facilities to integrated community living using a range of services including case management, residential habilitation, individual support and community habilitation, transitional services, homemaker services, personal care, respite, supported employment, specialized medical equipment, adult companions, home accessibility adaptations, transportation and therapies. Class Members who have applied to, and been determined eligible for, a waiver also received person-centered transition planning and Individual Service Plans (ISPs) that reflected their goals and vision for community living.

However, the federal government subsequently declined to approve Massachusetts' proposed Community First Demonstration program, which was a key part of the Settlement Agreement.  As a result, it became necessary to significantly modify the Settlement Agreement. Following mediation, the parties executed an Amended Agreement which was approved by the Court on September 18, 2013.[2]  Ex. A. The 2008 Settlement Agreement and, later, the Amended

---

[1] The certified class is comprised of all Medicaid-eligible adults with ABI, who experienced their brain injury after the age of 22, and who have been in a nursing facility 90 days or longer.

[2] Under the terms of the initial Settlement Agreement, the Defendants developed two Medicaid Home and Community Based Services waivers to serve individuals with ABI, and committed to implementing a Medicaid 1115 Demonstration that would, among other things, transition a specified number of Class Members from facilities to the community.  Despite extensive negotiations with the federal Centers for Medicare & Medicaid Services (CMS), however, the Defendants were unable to obtain federal approval for the 1115 demonstration project.

Agreement provided for the Court to exercise its jurisdiction and the equitable authority to hear and resolve motions for noncompliance.  Ex B, ¶ 44; Ex. A, ¶¶ 46-50.

The Amended Agreement incorporated the Defendants' Money Follows the Person Demonstration ("MFP Demonstration") as an additional vehicle for the provision of home and community-based services to Class Members.  The MFP Demonstration supported both the existing two MassHealth ABI waivers created under the initial Settlement Agreement and the development of two new waivers – one offering residential services (the MFP Demonstration Residential Habilitation waiver) and the other (the MFP Demonstration Community Living waiver) supporting individuals in their own homes or apartments.  These two MFP waivers, now known as the Moving Forward Plan ("MFP") waivers, provide community residential and non-residential supports to Class Members, as well as to a broad group of Medicaid-eligible Massachusetts residents who are not Class Members.

The Amended Agreement included specific numerical obligations governing the development of community waiver capacity, adding up to 1,174 additional waiver slots to the ABI and MFP waivers over the six-year term of the Amended Agreement,[3] pursuant to a yearly formula for adding additional waiver slots set forth in the Agreement.  Other substantive terms included: (1) conducting ABI and MFP waiver outreach in nursing and long-term rehabilitation facilities to identify Class Members and to inform them about the new community opportunities available under the MFP Demonstration and the ABI and MFP waivers; (2) expanding residential service options and making best efforts to increase residential provider network capacity in the ABI and MFP waivers; (3) ensuring Class Members who chose to transition to the

Accordingly, because the envisioned 1115 demonstration project had been key component of the settlement, the Plaintiffs and Defendants negotiated a new settlement to incorporate other terms in place of the 1115 demonstration project.

[3] The six-year term of the Amended Settlement Agreement covered the period from July 1, 2013 to June 30, 2019.

community transitioned from facility to community settings within 365 days of their enrollment in an ABI or MFP waiver, absent reasonable exceptions; and (4) adopting and implementing certain rules, regulations and policies for Class Members in the ABI and MFP waivers, including those designed to ensure individualized, person-centered planning, due process protections, and quality service delivery as specified in the Amended Agreement.[4]

Additionally, the Amended Agreement required the inclusion of certain waiver services in the ABI Residential Habilitation waiver, the reporting of certain data on Class Members to the Plaintiffs, and quarterly meetings between the Plaintiffs and the Defendants.  Finally, the Amended Agreement also provided a specific process for terminating the litigation.  Paragraph 51 of the Amended Agreement specifies that the Court shall dismiss the case with prejudice upon completion of the six-year term of the Amended Agreement, provided the Defendants have performed their obligations under the Amended Agreement and are in substantial compliance with all obligations of the Amended Agreement.  This provision further specifies that if the parties agree the Defendants have complied with the Amended Agreement, they will execute and file with the Court a joint motion for dismissal with prejudice of all claims for relief arising out of the complaint.

The Defendants and Plaintiffs agree that the Defendants have performed their obligations under the Amended Agreement and are in substantial compliance with its terms, as set forth in Attachment A and discussed below.  Therefore, the Defendants and Plaintiffs agree that the Defendants are entitled to dismissal.  Additionally, while not a part of the Amended Agreement,

---

[4] Policies, procedures, and regulations for administration of the ABI and MFP waiver programs include the following: (1) enrollment process for the MFP Demonstration and application process for the MFP waivers; (2) eligibility criteria and determinations; (3) appeals of denials, suspensions, reductions, and terminations of services through a fair hearing process; (4) needs assessment and care plan development consistent with person-centered planning principles; (5) service provision; and (6) establishment of a process for quality management that is consistent with each of the elements and sub-elements of CMS's HCBS Quality Framework.  Ex. A, ¶¶ 20, 23-24, 34.

in 2019 the Defendants sought and obtained federal approval for a 5-year renewal of the ABI and MFP waivers, evidencing the defendants' intent to continue the existing ABI and MFP waivers and the associated waiver related activities, including the development of waiver provider networks, and the maintenance of outreach strategies that enable eligible adults with disabilities in nursing facilities to make an informed choice regarding where to live.[5]

## II.     Defendants' Compliance with the Amended Agreement

This section describes the Defendants' compliance with the Amended Agreement, including the significant efforts and substantial resources committed by the Defendants to meeting their obligations under the Amended Agreement.  Additionally, this section delineates how the Defendants' efforts have transformed the lives of Class Members who have transitioned to the community under one of the ABI and MFP waivers and related outreach efforts.  Finally, this section provides an understanding of the Defendants' actions and efforts in implementing the Amended Agreement and their intent to continue the ABI and MFP waivers, and to maintain the progress that has been made since 2007, when this litigation first began.

As a starting point, central to the Amended Agreement was the Defendants' commitment to provide community residential and non-residential supports to Class Members as an alternative to receiving care in a nursing facility, which included expanding the number of waiver slots in the ABI and MFP waivers, as well as the services available under those waivers. Additionally, and integral to the commitment to expand access to ABI and MFP waiver services, the Defendants committed to ensuring Class Members were aware of the ABI and MFP waivers and how to make an informed choice whether to avail themselves of the services and benefits available under those waiver programs.  In order to accomplish both objectives, the Defendants

---

[5] The federal government approves Medicaid 1915(c) HCBS waivers in five-year terms.

enlisted the assistance of three state agencies in the implementation process: the Executive Office of Health and Human Services (EOHHS), the single state agency for the operation of the Massachusetts Medicaid program (MassHealth), the Department of Developmental Services (DDS), and the Massachusetts Rehabilitation Commission (MRC).

To ensure a wide range of community residential alternatives available to Class Members, the Defendants expanded residential services options and made best efforts to increase the network of residential services providers skilled in serving individuals with ABI.  To ensure quality of services provided to Class Members, the Defendants developed rules, regulations and policies that were consistent across the waivers.  Finally, to ensure a successful implementation of the Amended Agreement, the Defendants committed to meeting with the Plaintiffs on a quarterly basis to discuss progress on implementing the terms of the Amended Agreement and to share certain data with the Plaintiffs related to waiver enrollment, operations and oversight, outreach, policy development, and community transitions for Class Members who chose to enroll in one of the ABI and MFP waivers.  Implementation of the Amended Agreement in each of these areas is discussed in detail below.

A. Expansion and Provision of Community Residential and Non-Residential Supports

The Amended Agreement required, and the Defendants have utilized, the ABI and MFP waiver programs to provide an array of community residential and non-residential supports to Class Members who chose to enroll in one of the ABI and MFP waivers.  As part of this effort, the Defendants developed residential program sites for waiver-enrolled Class Members in a variety of settings to attempt to address participant choice and provide reasonable geographic coverage.  The Defendants arranged for waiver enrolled Class Members' individual transitions to these residential program sites through the transition planning process described below,

6

facilitating the discharge of 713 Class Members from nursing facility to residential community

settings as of December 31, 2020.  In addition, the Defendants expanded the community non-

residential supports available to participants in the ABI and MFP waivers and worked

collaboratively to ensure that Class Members interested in transitioning to community living

were offered the choice to receive services in the most integrated setting appropriate to their

needs.  The Defendants' efforts enabled the transition of 474 Class Members to non-residential

community settings as of December 31, 2020.  Ex. A, ¶¶ 26, 28.

To facilitate these community transitions, the Defendants, through their ABI and MFP

waiver case managers, engaged with Class Members in nursing and long-term rehabilitation

facilities to inform them, and their families, about the community living opportunities available

under the ABI and MFP waivers, including residential supports, in order to provide them with an

informed choice whether to remain in, or transition from, nursing facilities.  As described in

more detail below, these efforts included opportunities to see potential program locations, visit

communities where service may be offered, and to talk with peers and families who have already

experienced the transition to community-based services.

Upon a Class Member's decision to pursue a transition to community living, and

following a determination of eligibility for waiver services, case managers worked to identify an

appropriate residential setting.  Depending on the waiver and the individuals' needs and

preferences, this may have been a staffed residential program, shared living with a paid

caregiver, or independent living in a home or apartment.  Case managers conducted transition

planning activities to determine the individuals' vision for community living and the services and

supports needed to facilitate their transition.  They then oversaw the development of a person-

centered, Individualized Service Plan (ISP) using a process that is driven by the waiver

participant's goals and preferences. ISPs were developed in conjunction with the Class Member, and included their guardian, if any, relevant providers, state agency representatives, and others invited by the Class Member. During the ISP process, waiver enrolled Class Member's needs were identified, and their goals and objectives were addressed, through the provision of appropriate services in the community. Ex. A, ¶¶23, 25.

As of December 31, 2020, the Defendants have transitioned 1,187 individual class members (713 in residential settings through the Residential Habilitation waivers and 474 in other residential settings through the Community Living waivers) from facilities to the community since 2013, the first year of the Amended Agreement. Not all Class Members enrolled in a waiver transitioned to the community within the 365 days specified in the Amended Agreement due to a variety of factors, including, but not limited to, complexity of medical needs and geographic preferences. Ex. A, ¶ 18. However, all Class Members enrolled in one of the ABI and MFP waivers during the Agreement period have been offered community placement.[6] Ex. A, ¶ 18.

B. Creation of Additional Waiver Slots in the ABI and MFP Waivers.

The Amended Agreement required the Defendants to add up to an additional 1,174 "waiver slots"[7] to the ABI and MFP waivers over the six-year term of the Amended Agreement,

---

[6] For the small number of Class Members remaining in nursing facilities at the end of the Amended Agreement period, a review conducted by Defendants, and shared with Plaintiffs, indicated that either the Class Member or his or her guardian were either unwilling to move forward with transition, had experienced medical conditions that delayed transition, or had specific geographic preferences that could not be met. Individuals with ABI who applied for waiver services outside of the six year period covered by the Amended Agreement were substituted for those Class Members and were transitioned to the community. The waiver enrolled Class Members who have not yet transitioned to the community remain eligible for their applicable ABI or MFP waiver and DDS continues to work with these individuals to transition them to the community.

[7] A waiver slot is a term of art that refers to the ability to enroll and provide an individual waiver applicant with all needed waiver services.

in accordance with the specific terms set forth therein.  Ex. A, ¶ 2.[8]  The Defendants complied

with this obligation and over the six-year term of the Amended Agreement, the Defendants

added 1,083 "waiver slots" (694 residential and 389 non-residential) to the ABI and MFP

waivers in accordance with the terms set forth in the Amended Agreement.  Specifically, the

Defendants added the following number of additional waiver slots in each "Year" of the

Amended Agreement.  In Year One, the Defendants added an additional 75 residential and 45

non-residential waiver slots, in the manner specified in paragraph 4 of the Amended Agreement.

In Year Two, the Defendants added an additional 94 residential and 56 non-residential waiver

slots, in the manner specified in paragraph 5 of the Amended Agreement.  In Year Three, the

Defendants added an additional 118 residential and 56 non-residential waiver slots, in

accordance with the formula specified in paragraphs 8 and 9 of the Amended Agreement.  In

Year Four, the Defendants added an additional 148 residential and 70 non-residential waiver

slots, in accordance with the formula specified in paragraphs 8 and 9 of the Amended

Agreement.  In Year Five, the Defendants added an additional 148 residential and 88 non-

residential waiver slots, in accordance with the formula specified in paragraphs 8 and 9 of the

Amended Agreement.  And in Year Six, the Defendants added an additional 111 residential and

74 non-residential waiver slots, in accordance with paragraph 7 of the Amended Agreement.

In addition to the waiver slots required under the Amended Agreement, the Defendants

chose to add additional residential and non-residential waiver slots in future years through the

renewal of the ABI and MFP waivers, which was not required under the terms of the Amended

Agreement, thereby continuing to maintain and expand these services for both Class Members

---

[8] The Amended Agreement provided a formula for determining the exact number of waiver slots that must be created in each of the six waiver years.  The formula allowed for the creation of less waiver slots than the 1174 ceiling, which in fact occurred.

and other eligible nursing facility residents with other disabilities.  Specifically, as noted above, the Defendants have obtained federal approval for a five-year renewal of the ABI and MFP waivers (2019-2022), with year one of the renewal overlapping year six under the Amended Agreement.  As part of this renewal process, the Defendants included additional residential and non-residential waiver slots in each of the renewal years.  As a result, over the course of the five-year renewal period the Defendants are adding 864 additional residential and non-residential slots to the ABI and MFP waivers (414 residential and 450 non-residential), evidencing the Defendant's intent to continue providing services in a community setting under the ABI and MFP waivers to Class Members and other individuals as an alternative to nursing facility care.[9]

C.  Performance of ABI and MFP Waiver Outreach

Since there is no mandate in law or otherwise to impose community transitions on Class Members, the Amended Agreement required the Defendants to identify Class Members in nursing and long-term rehabilitation facilities and proactively inform them about the new community opportunities available under the MFP Demonstration and the ABI and MFP waivers.  Specifically, the Amended Agreement required the Defendants to assign an MFP transition coordinator or a case manager from an appropriate EOHHS agency to: (1) provide information on the MFP Demonstration and community living options under the MFP Demonstration; (2) engage the individual (and guardian, if any) in a discussion about community living; (3) address concerns regarding the transition from nursing facilities to the community; (4) assist the individual in completing appropriate waiver applications if the individual is interested in enrolling in the Demonstration and applying for a waiver; and (5) offer to arrange visits for

---

[9] Massachusetts federally approved 1915(c) waiver applications for the ABI and MFP waivers, which set forth the increase in waiver slots over the five year renewal period for these waivers, are available on-line at: https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/index.html

persons who have signed an MFP Informed Consent form if the individual (or their guardian, if any) expresses concerns about or a lack of familiarity with community living programs and a willingness to visit a community program.  Ex. A, ¶ 13.

Initially, the Defendants utilized contracted entities to perform the above-described outreach and as part of the MFP Demonstration.  In 2016, after the conclusion of the MFP Demonstration,[10] the Plaintiffs advocated for, and the Defendants developed and implemented, a comprehensive outreach model that improved upon past outreach efforts by utilizing what had been learned through the MFP Demonstration.  In developing this post-MFP demonstration outreach model, the defendants utilized state agency waiver personnel and a combination of other state agency resources and tools to ensure that Class Members in nursing and long-term rehabilitation facilities continued to be informed about the opportunities for community living under the ABI and MFP waivers, and that they were afforded the opportunity to make an informed choice.  The plaintiffs and defendants found that this new approach was significantly more successful in identifying persons with ABI who were interested in leaving nursing facilities and transitioning to the community.

The Defendants' post-MFP Demonstration ABI and MFP waiver outreach model incorporated the outreach requirements specified in the Amended Agreement and included, among other things: 1) the identification of persons with an ABI through direct nurse assessments, as well as through certain data sources, including Section Q of the long term care Minimum Data Set (MDS);[11] 2) targeted outreach to identified individuals in facilities, as well as

---

[10] The Massachusetts MFP Demonstration was a time limited, federally authorized Medicaid demonstration that ended in 2016.

[11] The MDS is a federally required standardized health screening and assessment tool for all residents of long-term care facilities certified to participate in Medicare or Medicaid.  Section Q of the MDS contains data on whether the long-term care resident is interested in leaving the facility and returning to the community.

general outreach to nursing facility residents by state agency waiver personnel from MRC and DDS who were assigned to visit specific nursing facilities; 3) a family to family/peer outreach program to promote the ABI and MFP waivers and to help educate interested persons with ABI in facilities about the benefits of community living and how to apply for the ABI and MFP waivers; and 4) training and education programs for nursing facility staff to raise awareness of the availability of the ABI and MFP waivers.  Taken together, these outreach methods typically result in hundreds of contacts with Class Members each quarter who may be interested in exploring community living options.  Given their success in reaching Class Members and supporting their informed choice to receive services in the community, the Defendants intend to continue these post Demonstration outreach efforts after the litigation is dismissed.

1.  *Identification Through Direct Nurse Assessments*

MassHealth Clinical Assessment and Eligibility (CAE) nurses conduct in-person clinical assessments of every person seeking MassHealth coverage of nursing facility services.  As part of the Defendants' post-MFP Demonstration outreach model, the Defendants revised the MassHealth clinical assessment tool that is used by CAE nurses to incorporate specific questions that seek to identify whether a person being assessed for MassHealth coverage of nursing facility services has an ABI and whether the person is interested in returning to the community.  When a CAE nurse conducts a MassHealth eligibility assessment of an individual in a nursing facility, if the CAE nurse identifies that an assessed individual has an ABI, is interested in returning to the community, and is not in active discharge planning, that individual is referred for direct follow-up.  State agency waiver staff meet with the individual to discuss the availability of the ABI and MFP waivers and the possibility of transitioning to the community under one of those programs.

2.  *Identification Through Certain Data Sources*

To further identify Class Members in nursing and long-term rehabilitation facilities who may be interested in transitioning to the community under one of the ABI and MFP waivers, the Defendants developed a process to ensure that representatives of an Aging and Disability Resource Center ("ADRC") or a state agency staff person meets with individuals who respond affirmatively to Section Q of the MDS.  Nursing home residents' responses to Section Q are collected monthly from facilities across the Commonwealth and are used to facilitate outreach meetings.  At these meetings, individuals and their guardians (if applicable) are provided with information on the ABI and MFP waiver programs, and offered assistance in applying for community-based services. Ex. A, ¶ 12.

3.  *Performance of State Agency Outreach in Nursing Facilities*

In addition to identification of Class Members through CAE assessments and MDS Section Q data, the Defendants also assigned state agency waiver personnel from MRC and DDS to conduct general outreach activities in designated facilities to raise awareness about the ABI and MFP waivers.  Through this more direct and individualized approach, the Defendants seek to build familiarity and trust between state agency waiver personnel and nursing facility residents and, at the same time, foster working relationships with nursing facility staff.  The overall goal of the post-MFP Demonstration approach is to promote increased opportunities for nursing facility residents to engage with state agency waiver personnel about options for community living under the ABI and MFP waivers, and through the building of working relationships with nursing facility staff, promote consistent identification and referrals of persons with ABI, as well as other persons who may be interested in, and eligible for, community living under the MFP waivers.

4. *Performance of Targeted Outreach to Certain Individuals*

Pursuant to the terms of the Amended Agreement, the Defendants also conducted and continue to conduct, as applicable, targeted outreach to certain individuals in facilities who: (1) were denied placement under the existing ABI waiver programs either for lack of an available waiver slot or by operation of the individual cost limit;[12] (2) were referred to EOHHS by a nursing facility social worker; or (3) have applied to and been found to meet the criteria for MRC's Statewide Head Injury Program (formerly referred to as BI&SSCS).  Ex. A, ¶11.

5. *Development of Family-to-Family and Peer Outreach Programs*

While CAE assessments, Section Q referrals, and targeted outreach to facilities may identify persons with an ABI who are interested in receiving services in the community, there may be other persons with an ABI in facilities who are hesitant to transition back to the community because of fear or other reasons, who are uncertain about the benefits of community living, or who decline to apply for participation in one of the ABI or MFP waivers.  To address these situations, the Amended Agreement required, and the Defendants implemented, a family-to-family program.  Ex. A, ¶ 14.  This program connects families who have a relative with an ABI who successfully transitioned to the community with families of potential applicants to discuss the ABI and MFP waivers and their personal experiences with transition back to the community.

After implementing the family-to-family program, however, the Defendants came to recognize that because many Class Members in nursing and long-term rehabilitation facilities are independent adults, outreach provided by peers who had successfully transitioned to the

---

[12] Although Paragraph 27 of the Amended Agreement permits Defendants to deny enrollment in the ABI waivers to individuals who are determined to require waiver services that exceed $194,486 per year in the ABI-RH waiver, or $99,890 per year in the ABI-N waiver, the Defendants removed these individual cost limits from its federally approved ABI waivers in 2013.  Today, there are no individual cost limits in the ABI or MFP waivers.

community under one of the ABI or MFP waivers would be an additional useful resource. Accordingly, the Defendants developed and implemented a peer outreach program.  Through peer outreach, individuals with an ABI who have successfully transitioned to the community are connected with potential applicants, family members, or facility staff either individually or in groups.  These peer volunteers share their personal experiences in transitioning to the community under one of these waivers.  With the help of current waiver participants, the Defendants also developed short videos for use in the outreach process.  These videos share the stories of individual class members who have transitioned from long term care facilities to the community and what their lives are like in the community.[13]

Additionally, and though a small part of their overall outreach efforts, the Defendants developed a marketing brochure for the ABI and MFP waivers.  Ex. C.  The brochure utilizes photos of Class Members who have transitioned from the facility to the community under one of the ABI and MFP waivers -- individuals who started their successful journey back to community living as a result of the Defendants' outreach efforts described herein.

6.  *Nursing Facility Social Worker and Facility Administrator Trainings*

The Defendants also developed and implemented trainings for nursing facility social workers and nursing facility administrators.  Through these training and education programs, the Defendants seek to increase awareness among nursing facility staff about the availability of the ABI and MFP waivers.  These periodic trainings have included trainings to long-term care ombudsman, trainings for larger multi-facility corporations, as well as trainings for nursing facility trade associations.

---

[13] An example of one of these videos is available at: https://www.youtube.com/watch?v=hc_mV_3z4dI&t=27s

Ultimately, as noted above, while there is no mandate in law or otherwise to impose community placement on Class Members in nursing and long-term rehabilitation facilities, the Defendants have developed and implemented a robust and multi-faceted outreach model that provides individualized information and the ability for individuals to learn about the benefits of community living, to visit community programs,[14] and to learn from others who have experienced transitions under the waivers. The model is individually-tailored to accommodate the person's disability or challenges, and incorporates an understanding that engagement and trust, as well as efforts to address underlying concerns or perceived barriers, can alter a person's view of the feasibility of more integrated community living. It also recognizes that individuals' preferences change over time. An answer of 'no' or 'not interested' today does not mean 'no' forever, or that the individual has waived their right to change their mind in the future. For example, through on-going interactions conducted over time by designated state agency waiver personnel visiting assigned nursing facilities and getting to know their residents, familiarity—and trust—is fostered. These relationships can lead to future discussions with potential waiver applicants that result in an expanded openness on the part of the individual and their family to the benefits of community living under the ABI and MFP waivers as an alternative to institutional care in a nursing facility. In line with this reality, the Defendants have structured the ABI and MFP waivers to provide continuous open enrollment, until annual waiver slot capacity is filled. Ex. A. ¶ 17.

D.  Expansion of Residential Service Options and Residential Provider Network Capacity in the ABI and MFP waivers

The Amended Agreement stated that "EOHHS will work with the Department of Developmental Services to outreach to providers of residential habilitation services to address

---

[14] For individuals who have been determined eligible for a waiver and are awaiting placement.

participant choice, reasonable geographic coverage, and the increase in waiver slots." Ex. A. ¶ 19.  In implementing this requirement, the Defendants – through DDS – made substantial efforts to increase the number and diversity of residential service providers, and to build an adequate, statewide network capacity for the ABI and MFP waivers.  As part of this effort, through DDS, and as discussed below, the Defendants engaged with providers of residential habilitation services to create new capacity, and address participant choice and reasonable geographic coverage.  These efforts resulted in a progressive and successful increase in the number of residential habilitation services providers with an expertise in delivering services to individuals with ABI.  As a result, residential habilitation services for the ABI and MFP waivers currently exist in all geographic regions of the state.  As evidenced by the Defendants' 2019 renewal of the ABI and MFP waivers, the Defendants intend to maintain adequate statewide service network capacity and provider choice for ABI and MFP waiver participants, and to provide timely access to waiver services including transportation, therapies, and day and supported employment services.

       1.    *Residential Provider Outreach and Capacity Development*

To create statewide residential programming capable of serving Class Members with ABI, DDS conducted outreach to established residential habilitation providers ("Providers") to develop interest in creating residential settings and other residential options for Class Members. DDS convened a subgroup of interested residential providers (and their trade association) to communicate about the demand for residential habilitation services and to collectively accomplish the goal of transitioning Class Members.  This group met continuously throughout the term of the Amended Agreement to address the challenges of creating network capacity in geographically diverse regions, including challenges related to building and staffing new homes,

and providing appropriate services for individuals.  Through this collaboration, DDS was able to identify and communicate to Providers the geographic areas where new residential development was needed, based on the interests of pending waiver eligible individuals in nursing facilities. DDS continued to support Providers in the siting of residential habilitation programs and encouraged them to maintain timelines in getting homes "online."

During this period, DDS service coordinators and MRC case managers worked with Providers to prepare to transition waiver enrolled Class Members from nursing facility settings to a community setting by facilitating the purchase of goods and services necessary to accomplish the establishment of a home, including furniture and other supports in the home.  DDS also collaborated with MRC to ensure that the purchases of essential items would not delay a waiver enrolled Class Member's transition.

2.    *Regional ABI Planning Teams*

DDS also established internal ABI/MFP regional "teams" who worked collaboratively across the state to support provider development and facilitate waiver enrolled Class Member transitions.  DDS's ABI service coordinators regularly contacted the individual Class Members and their families and guardians, where applicable, to present specific residential options as well as information about the availability of different residential models (group homes, shared living). With the knowledge of individuals' needs and preferences gathered through the planning process, ABI regional teams then worked closely with Providers to plan the development of new homes and to share appropriate referrals of pending waiver-eligible individuals.  ABI Team leadership worked with the Plaintiffs and the provider community to establish a referral process with clear timeframes and expectations to expedite the referral of eligible individuals for new home openings and existing vacancies.

The Amended Agreement further required the expansion of covered services in the ABI Residential waiver to include shared living and assisted living services, as defined in the MFP waivers.  Ex. A. ¶ 15.  The Defendants amended the ABI Residential waiver in 2013 (Year One of the Amended Agreement) to include these services.

3.    *Planning for Transition and Community Placement of Waiver Enrolled Class Members*

The planning for, and transition of, persons into the community requires the development of a person-centered transition plan and an Individualized Service Plan (ISP).  Both documents are organized by a DDS service coordinator or MRC case manager and involve the individual and their interdisciplinary team.  Ex. A. ¶ 26 ("The ISP planning process will determine: (1) what ABI community services and supports are needed to allow the person to live safely in the community; and (2) what ABI Waiver transition services are needed by the person residing in the nursing facility or rehabilitation hospital, for up to sixty days prior to discharge into the community, to facilitate the person's safe transition to the community.").  Both documents center the experience, goals and preferences of the waiver participant, and involve the support and feedback of an interdisciplinary team.  Ex. A. ¶ 25.

To implement these requirements, DDS service coordinators and MRC case managers worked with waiver enrolled Class Members, their guardians, if any, and relevant service providers while these Class Members were residing in the nursing facility.  Together, they identified each individual's strengths and needs, and planned for how those needs would be addressed in the community.  Services identified included community-based day and employment services, medical care, nursing, physical or occupational therapy, adaptive equipment or other waiver services.  As the Class Member's transition date approached, service coordinators arranged for the relevant waiver services to be provided in the community.  Within

30 days of moving to the community, the ISP was reviewed and finalized by the interdisciplinary ISP Team.

4.    *Increased Community Capacity for Persons with ABI*

Collectively, the Defendants have opened and operate approximately 230 ABI/MFP residential "group home" sites of 5 persons or less across the Commonwealth, and 47 "shared living" placements where the individual lives and receives care in the home of a caregiver. Across these settings, DDS supports 835 ABI and MFP residential waiver participants.

Further, despite the challenges posed by the pandemic in 2020 and obstacles to accessing Class Members residing in nursing facilities, between June 1, 2020 and November 1, 2020 147 individuals with ABI moved from nursing facilities into the community under the ABI and MFP waivers.  Between November 1, 2020 and March 16, 2021 an additional 48 individuals from nursing facilities moved into ABI and MFP community homes.  MRC case managers similarly worked to transition individuals from nursing facilities to homes and apartments in the community, facilitating 22 Class Member transitions in this same period.   DDS and MRC staff utilized virtual (telephonic or videoconference) communication to arrange meetings to plan and effectuate transition.  In spite of the barriers presented by the pandemic, state agency staff, provider staff and nursing facility staff were able to move individuals into the community and improve their quality of life and independence.

Some individual Class Members who became eligible during the final years of the Amended Agreement refused transition opportunities during this timeframe for reasons including, but not limited to, changing needs or specific geographic preferences.  These individuals had their decisions documented and reviewed by the parties, and were then replaced

by other individuals with ABI who were ready to move forward with transition to the

community.[15]

E.   <u>Adoption and implementation of certain rules, regulations and policies governing the ABI and MFP waivers</u>.

In addition to capacity, outreach, and provider network development, the Amended

Agreement also contained various requirements designed to ensure that Class Members who

transitioned to the community under one of the ABI or MFP waivers were informed of their

rights, that the waivers operated at a consistently high level of safety and quality, and that in

receiving services, Class Members were meaningfully informed of their options through a

person-centered planning process.  In implementing these requirements, the Defendants

developed written rules, regulations, and policies to govern the development of person-centered

plans for waiver enrolled Class Members as well as a process to appeal such plans, incident

reporting, investigations, mortality reviews, provider oversight, and oversight of the provider

network for the ABI and MFP waiver programs that were "substantially similar" to the rules and

regulations of DDS.  Ex. A, ¶¶ 20, 24.  During the development of the ABI and MFP waiver

policies, and the implementation of these quality management and monitoring structures, the

Defendants worked collaboratively with, and received the required input from the Plaintiffs.  Ex.

A, ¶ 20.  Attached as Exhibit D is a copy of the policies developed to govern implementation of

the ABI and MFP waivers.

Additionally, to more fully ensure that Class Members who transitioned to the

community under one of the ABI or MFP waivers were aware of their rights and all of the

---

[15] These waiver enrolled Class members continue to remain eligible for transition to the community and will continue to receive waiver transition planning from DDS after the dismissal of the Amended Agreement, as their waiver eligibility is not tied to the existence of the Amended Agreement, but rather is based on their eligibility for the HCBS waivers as specified in regulation at 130 CMR 519.007.

services available to them, the Defendants developed and issued a participant handbook to each

transitioning Class Member that describes the waivers, the services available under the waivers

and, importantly, participants' rights under the waivers.  The Defendants made a concerted effort

to include the voices of Class Members in the drafting and design of the handbook.  Specifically,

the Defendants convened a stakeholder workgroup that included waiver participants with brain

injuries.  The stakeholder workgroup provided valuable input on how to draft the handbook to

ensure that it was readily understandable to waiver participants.  The handbook represents

another way the Defendants have sought to ensure that Class Members and other waiver

participants are informed of their rights and the services that are available to them under the ABI

and MFP waivers and that this information is available to them in a readily understandable

format.  In addition to being developed jointly with Class Members, the handbook also utilizes

images of Class Members and scenes of their lives in the community.  As such, it operates not

only as a meaningful way of communicating aspects of the ABI and MFP waivers to current

waiver participants, but it also serves as an additional outreach tool for prospective waiver

applicants, telling a story of the prospects, possibilities, and benefits of community living under

the ABI and MFP waivers.  Ex. E.

   F.  Transitions

   Looking just at the numbers, as of December 31, 2020 and as a result of the above-

described efforts, the Defendants have transitioned 1,187 individuals (713 residential and 474

non-residential) from facilities to the community since 2013, the first year of the Amended

Agreement.  Raw numbers, however, do not tell the whole story.  Each number represents a

person who suffered an accident, an injury, or an adverse health event that resulted in a brain

injury and their long-term institutionalization in a nursing facility, but who was able to return to

integrated community living as a result of the Defendants efforts.  As stated above, and as evidenced by the five-year renewal of the ABI and MFP waivers beyond the term of the Amended Agreement, the Defendants intend to continue the success that has been achieved through the development and implementation of the ABI and MFP waivers and the associated outreach provided for those waivers.

## III.   Legal Standard for Compliance

The standard for determining whether to dismiss a systemic reform class action is whether defendants have substantially "satisfied" their obligations under the controlling order. *Fortin v.  Comm'r of the Dep't of Mass. Pub. Welfare,* 692 F.2d 790, 795 (1st Cir. 1982); *Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011); *Joseph A. v. N.M. Dep't of Human Servs.,* 69 F.3d 1081 (10th Cir. 1995).  As the First Circuit held in *Fortin*:

> No particular percentage of compliance can be a safe-harbor figure, transferable from one context to another.  Like "reasonableness," "substantiality" must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest.

692 F.2d at 795 (internal citation omitted).[16]

It is well-established that in public class action litigation, the standard for determining compliance with a court-approved Settlement Agreement is not one of perfection, but rather "substantial compliance."  *Rolland v Patrick*, 946 F. Supp.2d 246 (D. Mass. 2013). Where the parties have negotiated and agreed upon a specific number [of placements], achievement of those

---

[16] Other courts construing *Fortin* have held that, when important interests are at stake, numerical requirements in court orders should be "strictly enforced."  *Bates v. Dept. of Behavioral & Developmental Servs.,* 863 A.2d 890, 907 (Me. Sup. Ct. 2004); *see also Rolland v. Celluci,* 138 F.Supp.2d 110, 117-18 (D. Mass. 2001) (finding that the interests of the persons with disabilities in receiving adequate treatment is "great," and the "consequences of failure to comply" are "quite serious," and holding that numerical standards were to be strictly enforced).

numerical objectives is evidence of "substantial compliance." *Ricci v. Okin*, 537 F. Supp. 817, 836 (D. Mass. 1982).

In this matter, the Plaintiffs asserted violations of federal law alleging unnecessary institutionalization of individuals with ABI in nursing facilities.  After lengthy negotiations, the parties reached an initial settlement which was later updated via the Amended Agreement. Under the terms of the Amended Agreement, the Defendants were required, among other obligations, to create residential and non-residential community services through waiver programs for a specified number of Class Members, according to an agreed-upon formula.  The parties agree that the Defendants have substantially complied with those requirements and the other provisions of the Amended Agreement. The Defendants have added an additional 1,083 waiver slots in accordance with the terms of the Amended Agreement, and as of December 31, 2020, have transitioned 1,187 Class Members to the community since 2013, the first year of the agreement, thus achieving substantial compliance with the Amended Agreement's numerical obligations. Additionally, the Defendants have developed a successful outreach model designed to afford persons in nursing facilities the opportunity to make an informed choice whether to remain in the facility.  They have also developed family and peer-to-peer networks, implemented rules, regulations and policies governing the ABI and MFP waivers, expanded the services available under the ABI-Residential waiver, and provided data to and met with the Plaintiffs as specified in the Amended Agreement.  These actions further demonstrate substantial compliance with other non-numerical obligations under the Amended Agreement.  Finally, the Defendants have renewed the ABI and MFP waivers and have continued the associated ABI and MFP waiver outreach past the performance period of the Amended Agreement, evidencing their intent to continue these waivers and associated waiver functions beyond the end date of the Amended

Agreement including responsibility to maintain community residential capacity consistent with the renewed waivers.

Paragraph 51 of the Amended Agreement specifies that the Court shall dismiss the case with prejudice upon completion of the six-year term of the Amended Agreement, provided the Defendants have performed their obligations under the Amended Agreement and are in substantial compliance with all obligations of the Amended Agreement.

## IV.    Conclusion

For the reasons set out above, the parties agree that the Defendants have performed and are in substantial compliance with all their obligations under the Amended Agreement. Therefore, the parties respectfully request this Court schedule a hearing on this matter and grant their Joint Motion for Dismissal dismissing this action with prejudice, consistent with Fed. R. Civ. P. 23 and Paragraph 51 of the Amended Settlement Agreement.

Date:   August 24, 2021

RESPECTFULLY SUBMITTED,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Samuel Furgang

Samuel Furgang (BBO#559062)
Assistant Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 727-2000 ext. 2093

FOR THE PLAINTIFFS
BY THEIR ATTORNEYS

/s/ Steven J. Schwartz
Steven J. Schwartz (BBO#448440)
Kathryn L. Rucker (BBO#644697)
Center for Public Representation
22 Green Street
Northampton, MA 01060
(413) 586-6024

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2021, I electronically filed the foregoing document using the CM/ECF system. I certify that the counsel of record are registered as ECF filers and that they will be served by the cm/ecf system to: Steven J. Schwartz, sschwartz@cpr-ma.org and Kathryn L. Rucker, krucker@cpr-ma.org,

/s/ Samuel Furgang