**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**Western Division**

| | |
|---|---|
| Catherine Hutchinson, et al. )<br><br>Plaintiffs, )<br><br>)<br>v. )<br><br>Deval L. Patrick, et al. )<br><br>Defendants. )<br><br>) | Civil Action<br>No.  07-30084-MAP |

**AMENDED SETTLEMENT AGREEMENT**

The Court entered an order approving the original Final Comprehensive

Settlement Agreement on September 18, 2008.  This Amended Settlement Agreement is

intended to substitute for that original agreement.  In order to resolve all claims in this

matter, the parties agree as follows:

**I.      Transition of Persons with Acquired Brain Injury in Nursing and Long-Term Rehabilitation Facilities to the Community**

1.      The defendants will use the Massachusetts Money Follows the Person

Demonstration Project ("MFP Demonstration") and various waiver programs to provide

community residential and non-residential supports in an integrated setting to

Massachusetts Medicaid-eligible persons with an acquired brain injury[1] who are in

nursing and long-term rehabilitation facilities ("Class Members in Facilities").

---

[1]  When used anywhere in this Amended Settlement Agreement, "acquired brain injury" or "ABI" refers to all forms of brain injuries that occur after age 22, including without limitation brain injuries caused by external force, which are often referred to as "traumatic brain injuries" or "TBI," but not including Alzheimer's Disease and similar neuro-degenerative diseases the primary manifestation of which is dementia.

2.      Over the 6-year term of this Amended Settlement Agreement ("Agreement"), the defendants will provide up to 1174 waiver slots to Class Members in Facilities in the manner agreed to below in paragraphs 3-6.  Waiver slots will include integrated home and community-based waiver services consistent with a waiver participant's individual service plan.

3.      In this Agreement "Year 1" shall mean the twelve-month period beginning July 1, 2013.  "Year 2" shall mean the twelve-month period beginning July 1, 2014. "Year 3" shall mean the twelve-month period beginning July 1, 2015.  "Year 4" shall mean the twelve-month period beginning July 1, 2016.  "Year 5" shall mean the twelve-month period beginning July 1, 2017.  "Year 6" shall mean the twelve-month period beginning July 1, 2018.

4.      In Year 1, the defendants will add 75 residential waiver slots for Class Members in Facilities.  These slots will include residential and non-residential supports in an integrated setting provided through a residential waiver program.  The defendants will convert unfilled capacity in the existing ABI non-residential waiver to the ABI residential waiver, in order to provide 40 of the 75 residential waiver slots to be added in Year 1. The defendants will also add 45 non-residential waiver slots, which will be available to eligible Class Members in Facilities.  These slots will include non-residential supports provided through the MFP non-residential waiver program and other non-residential waiver programs.

5.      In Year 2, the defendants will add 94 residential waiver slots for Class Members in Facilities.  These slots will include residential and non-residential supports in an integrated setting provided through a residential waiver program.  The defendants will

also add 56 non-residential waiver slots, which will be available to eligible Class Members in Facilities.  These slots will include non-residential supports provided through the MFP non-residential waiver program and other non-residential waiver programs.

6.      In Years 3-5, the number of additional residential and non-residential waiver slots to be added for Class Members in Facilities in each year will be determined based on the demand for either residential or non-residential waiver services, as calculated in ¶¶ 8-9.

7.      In Year 6, the number of additional residential waiver slots to be added for Class Members in Facilities will be 111 and the number of additional non-residential waiver slots to be added for Class Members in Facilities will be 74.

8.      If at least one Class Member in a Facility is denied waiver services in Years 2-4 due to a lack of capacity in the MFP and ABI waivers, then demand for waiver services to Class Members in Facilities will be deemed to have exceeded capacity in that year.  The determination of whether demand exceeds capacity will be made separately for the residential and the non-residential waiver slots described in ¶¶ 5-6.  When demand exceeds capacity in Year 2, 3, or 4 for either the residential or the non-residential waiver slots described in ¶¶ 5-6, the capacity for either or all of those waivers for the next year will be increased by 125% of the number of slots added in the prior year.  If demand does not exceed capacity in Year 2, 3, or 4 for either the residential or non-residential waiver slots described in ¶¶ 5-6, the capacity for either or all of those waivers will increase by 100% of the number of slots added in the prior year.

9.      The calculation of demand and determination of capacity to be added for Class Members in Facilities will be done annually in Years 2, 3, and 4 of this Agreement.

The calculation will be made based upon demand during the twelve-month period ending on September 30th .

## II.   MFP and ABI Waiver Outreach

10.   EOHHS will implement an expanded outreach effort to ensure that Class Members in Facilities are aware of new options available under the MFP Demonstration. This expanded outreach will utilize various entities assigned to defined service areas and contracted to proactively identify and enroll MFP Demonstration-eligible Class Members in Facilities who are interested in transitioning to the community and to inform nursing facility social workers about the services offered through the MFP Demonstration.

11.   During Years 1-6, EOHHS will assign an MFP Transition Coordinator or a case manager from an appropriate EOHHS agency or contractor to meet with all Class Members in Facilities who: (1) were denied placement under the existing ABI waiver programs either for lack of an available waiver slot or by operation of the individual cost limit; (2) were referred to EOHHS by a nursing facility social worker; or (3) have applied to and been found to meet the criteria for the Massachusetts Rehabilitation Commission's ("MRC's") Brain Injury Statewide Specialized Community Services ("BI&SSCS") program.

12.   During Years 2-5, EOHHS will ensure that an employee representative of an Aging and Disability Resource Center ("ADRC") shall meet with individuals who have responded affirmatively to Section Q question 0500 of the Nursing Home Minimum Data Set ("MDS Section Q") regarding their desire to leave the facility and receive services in the community.  If the ADRC employee representative determines that the individual is a Class Member in a Facility, then the ADRC shall notify EOHHS.  EOHHS

will assign an MFP Transition Coordinator or case manager from an appropriate EOHHS

agency or contractor to meet with all such identified Class Members in Facilities.

Nothing in this paragraph shall require that a clinical assessment be completed in order to

determine whether any individual is a Class Member in a Facility.

13.    During these outreach meetings with identified Class Members in

Facilities, the MFP Transition Coordinator or a case manager from an appropriate

EOHHS agency or contractor will: (1) provide information about the MFP Demonstration

and community living options under the MFP Demonstration; (2) engage the individual

(and guardian, if any) in a discussion about community living; (3) address concerns

regarding the transition from nursing facilities to the community; (4) assist the individual

in executing an MFP Informed Consent form and completing appropriate waiver

applications if the individual is interested in enrolling in the Demonstration and applying

for a waiver; and (5) offer to arrange visits to community living programs for persons

who have signed an MFP Informed Consent form if the individual (or their guardian, if

any) expresses concerns about or a lack of familiarity with community living programs

and a willingness to visit a community program.

14.    If despite the above efforts, one or more of the residential or non-

residential waiver slots addressed in this Agreement remains unfilled at the end of Year 3

or at the end of any subsequent year of this Agreement, then the defendants will:

     a.    fund family-to-family programs to meet with Class Members in

     Facilities (and their guardians, if any) who are agreeable to such a meeting and

     who have not yet signed an MFP Informed Consent form due to concerns about

     transitioning to the community;

b.      assign an MFP Transition Coordinator or case manager from an appropriate EOHHS agency or contractor to meet with up to 100 Class Members in Facilities with traumatic brain injury who have not responded "yes" to MDS Section Q and who have neither applied for MRC's BI&SSCS program nor met with an MFP Transition Coordinator as described in Paragraph 13, consistent with federal requirements.

**III.    ABI Residential Habilitation Waiver**

15.      The defendants will expand the covered services in the ABI Residential Habilitation waiver to include shared and assisted living services, as defined in the MFP waivers.

16.      EOHHS will issue the following statement to all residential habilitation waiver service providers on or before July 1, 2013 or within thirty days after the final approval of this Agreement, whichever is later:  "This is to notify you that you are obligated to deliver services and supports, including assistance with activities of daily living, through your residential and/or program staff, and facilitate access to ancillary services such as State Plan Personal Care Attendant services, consistent with the waiver service definition for residential habilitation and applicable regulations and residential provider policies, as incorporated in your contract with EOHHS."

**IV.    Waiver Administration**

A.      Application and Enrollment

17.      The defendants will use a continuous enrollment process for the ABI residential waiver and for the MFP community living and residential waivers.

B.      Transition Time Periods

18.      Starting in Year 2, each Class Member in a Facility will transition to the community within 12 months of his or her enrollment in a waiver, absent reasonable exceptions.

C.      Residential Provider Network Capacity

19.      EOHHS will make best efforts to increase residential provider network capacity for the ABI and MFP waivers.  As part of this effort, EOHHS will work with the Department of Developmental Services to outreach to providers of residential habilitation services to address participant choice, reasonable geographic coverage, and the increase in waiver slots.

D.      Program Administration

20.      EOHHS will ensure that written rules, regulations, and policies concerning client rights, investigation, incident management, mortality review, provider oversight, and the provider network for the MFP and ABI waiver programs that are substantially similar to the written rules, regulations, and policies of the Department of Developmental Services, are adopted and implemented, to the extent such rules, regulations, and policies are appropriate and applicable to persons with ABI.  The plaintiffs will have an opportunity to comment on any new rules, regulations, and policies related to this section before they are finalized.

V.      **Acquired Brain Injury Waiver Program**

21.      On January 30, 2013, the defendants submitted a proposal to the Centers for Medicare and Medicaid Services ("CMS"), pursuant to Section 1915(c) of the Social

Security Act, for renewal of waiver programs to serve persons with an acquired brain injury (hereafter, the "ABI Waivers").

22.     The community services provided in the ABI Waivers will include all of the community residential and nonresidential services as approved in the existing ABI Waivers, with the exception of the Community-Based Substance Abuse Treatment service, which has previously been identified by CMS as not having a home- and community-based character.  In addition, the following services were requested in the renewal application for the ABI-Residential Habilitation waiver:  Shared Living 24-hour Supports, and Assisted Living Services.

23.     Services under the ABI Waivers will be provided pursuant to an Individualized Service Plan ("ISP") that is based upon person-centered principles and is developed along with the Waiver participant.  ABI Waiver participants will be provided an ISP, annual updates of the ISP, and the services set forth in their ISP.

24.     In the ABI Waiver renewal applications, the defendants described (a) policies and procedures for the administration of the ISP planning process; and (b) an administrative fair hearing process as described in 42 C.F.R. 431.200, *et seq.*, Subpart E, for disputing the following actions by an agency designated by EOHHS: (1) a determination denying participation in an ABI Waiver; or (2) denials, suspensions, reductions, and terminations of the service requirements of an ISP, including a substantial failure to implement the service requirements of the ISP within the terms and conditions of the ABI Waivers as approved by CMS.  The plaintiffs through their counsel will have an opportunity to review and comment on new policies and procedures related to this section before they are finalized.

25.     The ISP will be developed by an interdisciplinary team that is coordinated by the service coordinator and that includes the individual, his/her guardian if any, relevant providers, and representatives of the agency responsible for operating an ABI Waiver.

26.     The ISP planning process will determine: (1) what ABI Waiver community services and supports are needed to allow the person to live safely in the community; and (2) what ABI Waiver transition services are needed by the person residing in the nursing facility or rehabilitation hospital, for up to sixty days prior to discharge into the community, to facilitate the person's safe transition to the community.

27.     In order to comply with federal cost neutrality requirements for Section 1915(c) waivers, and pursuant to 42 CFR 441.301(a)(3), the defendants may refuse entrance to the ABI Residential Habilitation Waiver to any person with an acquired brain injury when the defendants reasonably expect that the annual Medicaid costs of care furnished to that person with an acquired brain injury, including residential habilitation and other ABI Waiver services plus Title XIX state plan services, will exceed $194,486. The defendants may refuse entrance to the ABI Non-Residential Habilitation Waiver to any person with an acquired brain injury when the defendants reasonably expect that the annual Medicaid costs of care furnished to that person with an acquired brain injury, including ABI Waiver services other than residential habilitation and Title XIX state plan services, will exceed $99,890.  These cost limits shall be specified in Appendix B-2 of the ABI Waiver renewals submitted to CMS for its approval, and shall be updated annually to reflect current rates of payment.

28.     Persons with an acquired brain injury who are participating in an ABI Waiver will be offered the choice to receive services in the most integrated setting appropriate to their needs such as their own homes or apartments, shared living arrangements such as group homes, or with their families and consistent with the ABI Waivers as approved by CMS.  This provision does not create an obligation to purchase a house, apartment, or other dwelling for a class member enrolled in an ABI Waiver, and is subject to the net state cost limit in ¶ 29 and all other terms of the ABI Waivers.

29.     The net state cost for ABI Waiver services and for all other Medicaid and state-funded services for participants in the ABI Waiver programs shall not exceed $18.75 million over three years from the date of CMS approval of the ABI Waiver renewals.  In order to ensure that the net state cost does not exceed this limit, the defendants will estimate the total annual state cost for each ABI Waiver participant at the time of enrollment and will reevaluate, twice a year, the projected total cumulative state cost for each ABI Waiver participant.[2]  In the event that the net state cost is projected to exceed the $18.75 million net state cost limit, the defendants may initiate corrective action to bring the ABI Waivers into alignment with this limit.  Corrective actions may include, but shall not be limited to, the submission of amendments to the approved ABI Waivers, a freeze on new ABI Waiver enrollments, a reduction in the number of prospective ABI Waiver participants, changes in the ABI Waiver service specifications,

---

[2]  The $18.75 million net state cost cap refers to the net cost, counting federal financial participation ("FFP"), of ABI Waiver services and of all other Medicaid and state-funded services and supports for participants in the ABI Waiver programs combined, including administrative and case management costs, compared to the net cost, counting FFP, of all Medicaid and state-funded services and supports for those participants if they were not enrolled in the ABI Waiver programs.  This calculation shall include historically based growth rate projections and actual costs to date for each service included in the calculation.

limitations on the amount of ABI Waiver services or changes in the individual cost limits described in ¶ 27.

30.     Appendix B of the ABI Waiver renewals will provide that all class members in nursing facilities or rehabilitation hospitals can apply for the ABI Waivers. Appendix B of each renewal will specify:

a.     the number of participants that the defendants expect to serve during each year that the ABI Waiver is in effect;

b.     applicable federal and state Medicaid requirements;

c.     other applicable eligibility requirements, including: (i) the requirement that the prospective participant can be safely served in the community within the terms of the ABI Waiver and the cost limits described in ¶¶ 27 and 29 above, and consistent with CMS requirements for a Home- and Community-Based Service ("HCBS") waiver; and (ii) any requirement with respect to nursing facility length of stay as a prerequisite to ABI Waiver participation; and

d.     procedures for the evaluation and reevaluation of level of care. Appendix B will also describe an orderly, rational, and fair process for the consideration of applications for enrollment in the ABI Waiver and for the allocation of openings in the ABI Waiver.

31.     The defendants will maintain policies and procedures for administration of the ABI Waivers concerning the following: (1) waiver application; (2) eligibility criteria; (3) appeals, including as stated in ¶ 24, above; (4) needs assessment; (5) service provision; and (6) establishing a process for quality management that incorporates each

of the elements and sub-elements of CMS's HCBS Quality Framework, as described in CMS's August 29, 2002 letter to State Medicaid Directors, or any subsequent revisions thereto, and each of the six assurance areas and relevant sub-assurance areas as required for 1915(c) waivers by CMS.  The plaintiffs through their counsel will have an opportunity to review and comment on new policies and procedures related to this section before they are finalized.

32.     The defendants will provide case management for all persons enrolled in the ABI Waivers.

33.     A senior staff person within EOHHS will oversee and assist in the implementation of the ABI Waivers.  Agencies designated by EOHHS shall be responsible for operating the ABI Waivers and for ensuring that ABI Waiver requirements of this Agreement are implemented.

**VI.    MFP Demonstration Project**

34.     The defendants will develop and implement policies and procedures for administration of the MFP Demonstration and MFP waivers concerning the following: (1) enrollment process for the MFP Demonstration and application process for the MFP waivers; (2) eligibility criteria and determinations; (3) appeals of denials, suspensions, reductions, and terminations of services through a fair hearing process; (4) needs assessment and care plan development consistent with person-centered planning principles; (5) service provision; and (6) establishment of a process for quality management that is consistent with each of the elements and sub-elements of CMS's HCBS Quality Framework, as described in CMS's August 29, 2002 letter to State Medicaid Directors, or any subsequent revisions thereto, and the six assurance areas and

relevant sub-assurance areas as required for 1915(c) waivers by CMS.  The defendants will ensure that those staff responsible for assessing the needs of and developing a care plan for a person with an acquired brain injury who is enrolled in the MFP Demonstration will have the appropriate knowledge and understanding of the needs of persons with an acquired brain injury.  The plaintiffs through their counsel will have an opportunity to review and comment on new policies and procedures related to this section before they are finalized.

35.     A senior staff person within EOHHS will oversee the implementation of the MFP Demonstration and the MFP waivers.  The Commonwealth shall designate an agency or agencies to be responsible for operating the MFP Demonstration and for ensuring that the MFP Demonstration Project and MFP waivers requirements of this Agreement are implemented.

## VII.   Data Collection and Reporting

36.     The defendants will provide the following quarterly data for Class Members in Facilities:

a.      the number of persons who have enrolled in the MFP Demonstration, applied for the MFP waivers, and applied for the ABI residential and nonresidential waivers, as well as the length of time for applications for the MFP and ABI waivers to be processed;

b.      the identification of all Class Members in Facilities who have met with MFP Transition Coordinators or case managers described in ¶ 13 and a report on whether or not the person has enrolled in the MFP Demonstration;

c.      the number of eligibility determinations for the MFP and ABI

waivers, and the reason for waiver denials;

d.      the transition time for each Class Member in a Facility enrolled in

any waiver, and an explanation for any case exceeding 12 months; and

e.      the names, addresses and guardians (if any) of each Class Member

in a Facility who has applied for MRC's BI&SSCS program or affirmatively

answered MDS Section Q, provided such group can be identified, provided that

authorization to share CMS data is received, and consistent with ¶ 52 of the

original Final Comprehensive Settlement Agreement.

37.     To the extent authorized by protective orders in this case, the defendants

shall provide the plaintiffs' counsel with (a) the names, addresses, and telephone

numbers, of persons with an acquired brain injury who are participating in an ABI

Waiver, and of their guardians, if any, and the ISPs of such ABI Waiver participants; and

(b) the names, addresses, and telephone numbers of  persons with an acquired brain

injury who are participating in the MFP waiver, and of their guardians, if any, and the

ISPs of such MFP waiver participants.  This provision does not create a continuing

obligation to provide the above information after the individual is living in the

community.

## VIII.   Nursing Facility Admission and Services

38.     The defendants will not pay for the stay of a person with an acquired brain

injury in a nursing facility unless the requirements in duly promulgated regulations set

forth at 130 CMR 456.407 and 130 CMR 456.408 are met.  The defendants will assist

nursing facilities, long-term care options counseling entities and other community-based

organizations in making available to individuals in nursing facilities or planning to enter

nursing facilities, information about community service options.

39.     For persons with an acquired brain injury in nursing facilities who are

preparing to transition to the community through participation in an ABI Waiver and/or

the MFP Demonstration, the defendants will make payments to therapists in accordance

with duly promulgated regulations set forth at 130 CMR 432 and 130 CMR 450 for

ongoing therapy services.  Any appeal of the denial, suspension, reduction or termination

of payment for therapy services will be pursuant to the fair hearing process described in

42 C.F.R. § 431.200 *et seq.*

40.     The ABI Waiver service coordinator and the MFP Transition Coordinator

or case manager from an appropriate EOHHS agency or contractor shall make best

efforts to communicate with licensed clinicians in the nursing facility who are responsible

for the care of an ABI Waiver participant in a nursing facility, or a MFP waiver

participant in a nursing facility, so that the transitional service component of the

transition planning process is coordinated with the participant's medical care, including

necessary therapies.

**IX.    Funding**

41.     The defendants' obligations under this Agreement are subject to

appropriations by the Legislature and the availability of FFP for the ABI Waivers, State Plan

services, and the MFP Demonstration.  In order to implement this Agreement, which

resolves the federal statutory claims set forth in the Amended Complaint, the defendants will

submit budget requests as needed and will, consistent with Art. 63 of the Massachusetts

Constitution, make their best efforts to obtain the funding necessary to implement this Agreement.

## X.     Court Approval and Enforcement

42.     This Agreement represents a full and fair resolution of the claims for relief alleged in the Amended Complaint.

43.     In preparation for a fairness hearing pursuant to Fed. R. Civ. P. 23(e), the parties will jointly file a motion for preliminary approval of this Agreement together with a notice of settlement that describes the process for filing written objections and includes the date for the fairness hearing.  The parties will cooperate in presenting this Agreement to the Court at the fairness hearing.

44.     This Agreement shall be subject to the approval of the Court.  If the Agreement is so approved, the original Final Comprehensive Settlement Agreement shall be vacated.  This Agreement may be enforced only as set forth in ¶¶ 46 through 50 below.

45.     If the Court does not approve this Agreement in all respects, this Agreement shall be null and void and of no force and effect, and nothing herein shall be deemed to prejudice the position of any of the parties with respect to the litigation or otherwise, and neither the existence of this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be admissible in evidence, referred to for any purpose in the litigation or in any other litigation or proceeding, or construed as an admission, presumption or concession by defendants of any liability or the truth of any of the allegations in this litigation.

46.     The Court shall retain jurisdiction to hear and adjudicate noncompliance

motions filed in accordance with ¶¶ 49 through 50, below.

47.   No less than thirty days prior to filing any noncompliance motion,  the plaintiffs shall notify the defendants of any alleged noncompliance with this Agreement and request a meeting for the purpose of attempting to resolve the problems identified by the plaintiffs regarding the defendants' alleged noncompliance.

48.   Should the parties fail to resolve the problems identified by the plaintiffs, the parties shall engage in mediation with a mutually acceptable mediator.

49.   Should the parties fail to resolve, through mediation, any problems identified by the plaintiffs, the plaintiffs may file a motion with the Court seeking a judicial determination that the defendants are not substantially complying with this Agreement.  The defendants shall have no less than thirty days to respond to any such motion.  If the Court finds that the defendants have not substantially complied with this Agreement, it may enter an order consistent with equitable principles, but not an order of contempt, that is designed to achieve compliance.

50.   If the plaintiffs contend that the defendants have not complied with an order entered under the preceding paragraph, they may, after reasonable notice to defendants, move for further relief from the Court to obtain compliance with the Court's prior order.  In ruling on such a motion, the Court may apply equitable principles and may use any appropriate equitable or remedial power then available to it.

51.   The Court shall dismiss this action with prejudice upon the completion of Year 6 provided that the defendants have performed their obligations under this Agreement and at that time are in substantial compliance with all obligations under this Agreement.  The defendants will provide the plaintiffs with at least sixty days' notice of

their intent to seek dismissal.  If the parties agree that the defendants are entitled to dismissal, the parties will execute and file with the Court a joint motion for dismissal with prejudice of all claims for relief arising out of the Complaint.   If the parties do not agree, the defendants may independently move for entry of such a dismissal.  The plaintiffs shall have up to sixty days to oppose such a motion.

## XIII.   Miscellaneous

52.     Nothing in this Agreement shall require EOHHS to purchase a house, apartment, or other dwelling, or to create Assisted Living residences for Class Members in Facilities.

53.     Nothing in this Agreement shall require EOHHS to place Class Members in Facilities in waivers for which they are not eligible.

54.     Nothing in this Agreement shall require EOHHS to reserve or designate waiver slots in the MFP residential or non-residential waiver programs for Class Members in Facilities.  EOHHS will administer the waiver programs in a manner designed to serve persons who are ineligible for the ABI waivers in the MFP waiver programs to the extent they are eligible for MFP waivers.

55.     The parties shall meet quarterly to discuss any issues relevant to implementation of this Agreement.

56.     Either party may move to vacate the Settlement Agreement and the plaintiffs may proceed with litigating the case in any of the following circumstances:

a.     CMS does not approve the ABI Waivers, the MFP waivers, the MFP Demonstration or renewals of such, or approves any of these programs in a

manner that impedes or precludes compliance with the provisions of this Agreement;

b.      the Legislature does not appropriate and the defendants do not obtain from other sources necessary funding to perform their obligations under this Agreement.

57.    By mutual agreement, the parties may change the terms of this Agreement, including, but not limited to, the timetables for taking specific actions, provided that such mutual agreement is memorialized in writing, signed by the parties and approved by the Court.

58.     The headings of the sections of this Agreement are for convenience only and will not affect the construction hereof.

59.    This Agreement constitutes the entire agreement of the parties, and supersedes all prior agreements, representations, negotiations, and undertakings not set forth or incorporated herein, including the original Final Comprehensive Settlement Agreement.

60.    Neither this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed against either party as an admission, presumption, concession or finding of liability or wrongdoing.

61.    This Agreement is the result of arm's-length negotiations.  Since the plaintiffs and the defendants contributed substantially, materially and cooperatively in drafting this Agreement, it shall not be more strictly construed against one party than the other.

For the Plaintiffs,

_Kathryn Rucker_

Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:


_____

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date:


_____

Michael R. Dube
Choate Hall and Stuart LLP
2 International Place
Boston, MA 02110
Date:


_____

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date:


For the Defendants,


_____

Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:

For the Plaintiffs,


_____

Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:

_Richard A. Johnston_

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date: 6/19/13


_____

Michael R. Dube
Choate Hall and Stuart LLP
2 International Place
Boston, MA 02110
Date:


_____

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date:


For the Defendants,


_____

Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:

For the Plaintiffs,


_____

Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:


_____

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date:

*Michael R Dube*

Michael R. Dube
Choate Hall and Stuart LLP
2 International Place
Boston, MA 02110
Date: 6/19/13


_____

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date:



For the Defendants,


_____

Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:

For the Plaintiffs,


_____
Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:


_____
Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date:



_____
Michael R. Dube
Choate Hall and Stuart LLP
2 International Place
Boston, MA 02110
Date:


_____
Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date: June 19th, 2013



For the Defendants,


_____
Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:

For the Plaintiffs,

_____

Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:

_____

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date:

_____

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date:

For the Defendants,

_____

Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:  6/17/13

_____

Secretary John Polanowicz
Executive Office of Health and Human Services
One Ashburton Place
Boston, MA 02108
Date:

20

For the Plaintiffs,

_____

Steven J. Schwartz, Esq.
Kathryn Rucker, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date:

_____

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date:

_____

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date:

For the Defendants,

_____

Secretary Glen Shor
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date:

_____

Secretary John Polanowicz
Executive Office of Health and Human Services
One Ashburton Place
Boston, MA 02108
Date:    6/18/2013

20