## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
### Western Division

| | |
|---|---|
| Catherine Hutchinson, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action |
| | ) No.  07-30084-MAP |
| v. | ) |
| | ) |
| Deval L. Patrick, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

### FINAL COMPREHENSIVE SETTLEMENT AGREEMENT

In order to resolve all claims in this matter, the parties agree as follows:

I.      **Community Services Development**

1.      The defendants will take the following actions to expand community residential and nonresidential supports for Massachusetts Medicaid-eligible persons with an acquired brain injury (hereafter, "persons with an acquired brain injury"[1]) who are in nursing facilities or rehabilitation hospitals.

A.      *New Acquired Brain Injury Waiver Program*

2.      Within six months of the Court's approval of this Settlement Agreement, the defendants will submit a proposal to the Centers for Medicare and Medicaid Services (CMS), pursuant to Section 1915(c) of the Social Security Act, for a new waiver program to serve three hundred persons with an acquired brain injury (hereafter, the "ABI Waiver" or "Waiver").  The plaintiffs through counsel will have the opportunity to review and

---

[1]   When used anywhere in this agreement, "acquired brain injury" or "ABI" refers to all forms of brain injuries that occur after age 22, including without limitation brain injuries caused by external force, which are often referred to as "traumatic brain injuries" or "TBI," but not including Alzheimer's Disease and similar neuro-degenerative diseases the primary manifestation of which is dementia.

comment on the ABI Waiver application prior to submission.  To accomplish the
purposes of this Settlement Agreement, the defendants may either apply for a single
1915(c) waiver or apply for two concurrent 1915(c) waivers.

     3.     The community services provided in the ABI Waiver program will include
all of the community residential and nonresidential services currently provided in the
Traumatic Brain Injury Waiver operated by the Massachusetts Rehabilitation
Commission (MRC), except that residential habilitation shall be limited to no more than
100 Waiver participants with an acquired brain injury at any point in time.

     4.     ABI Waiver services will be provided pursuant to an Individualized
Service Plan (ISP) that is based upon person-centered principles and is developed along
with the Waiver participant.  ABI Waiver participants will be provided an ISP, annual
updates of the ISP, and the services set forth in their ISP.

     5.     In the ABI Waiver application, the defendants will describe  (a) policies
and procedures for the administration of the ISP planning process; and (b) an
administrative fair hearing process as described in 42 C.F.R. 431.200, *et seq.*, Subpart E.,
for disputing the following actions by MRC: (1) a determination denying participation in
the ABI Waiver; or (2) denials, suspensions, reductions, and terminations of the service
requirements of an ISP, including a substantial failure to implement the service
requirements of the ISP within the terms and conditions of the ABI Waiver as approved
by CMS.  The plaintiffs through their counsel will have an opportunity to review and
comment on the draft policies and procedures before they are finalized.

     6.     The ISP will be developed by an interdisciplinary team that is coordinated
by the service coordinator and that includes the individual, his/her guardian if any,

relevant providers, and representatives of the agency responsible for operating the ABI Waiver.

7.     The ISP planning process will determine: (1) what ABI Waiver community services and supports are needed to allow the person to live safely in the community; and (2) what ABI Waiver transition services are needed by the person residing in the nursing facility or rehabilitation hospital, for up to sixty days prior to discharge into the community, to facilitate the person's safe transition to the community.

8.     In order to comply with federal cost neutrality requirements for Section 1915(c) waivers, and pursuant to 42 CFR 441.301(a)(3), the defendants may refuse entrance to the ABI Waiver to any person with an acquired brain injury when the defendants reasonably expect that the annual Medicaid costs of care furnished to that person with an acquired brain injury, including residential habilitation and other ABI Waiver services plus Title XIX state plan services, will exceed $164,131. The defendants may refuse entrance to the ABI Waiver to any person with an acquired brain injury when the defendants reasonably expect that the annual Medicaid costs of care furnished to that person with an acquired brain injury, including ABI Waiver services other than residential habilitation and Title XIX state plan services, will exceed $87,919. These cost limits shall be specified in Appendix B-2 of the ABI Waiver proposal submitted to CMS for its approval, and shall be updated annually to reflect current rates of payment.

9.     Persons with an acquired brain injury who are participating in the ABI Waiver and who are to receive residential habilitation will be offered the choice to receive services in the most integrated setting appropriate to their needs, such as their own homes or apartments, shared living arrangements such as group homes, or with their

3

families. This provision does not create an obligation to purchase a house, apartment, or other dwelling for a class member enrolled in the ABI Waiver, and is subject to the net state cost limit in ¶10 and all other terms of the ABI Waiver.

10.     The net state cost for ABI Waiver services and for all other Medicaid and state-funded services for participants in the ABI Waiver program shall not exceed $15 million over three years from the date of CMS approval of the ABI Waiver. In order to ensure that the net state cost does not exceed this limit, the defendants will estimate the total annual state cost for each ABI Waiver participant at the time of enrollment and will reevaluate, twice a year, the projected total cumulative state cost for each ABI Waiver participant.[2] In the event that the net state cost is projected to exceed the $15 million net state cost limit, the defendants may initiate corrective action to bring the ABI Waiver into alignment with this limit. Corrective actions may include, but shall not be limited to, the submission of amendments to the approved ABI Waiver, a freeze on new ABI Waiver enrollments, a reduction in the number of prospective ABI Waiver participants, changes in the ABI Waiver service specifications, limitations on the amount of ABI Waiver services or changes in the individual cost limits described in ¶ 8.

11.     Appendix B of the ABI Waiver proposal will provide that all class members in nursing facilities or rehabilitation hospitals can apply for the ABI Waiver. Appendix B will specify:

---

[2] The $15 million net state cost cap refers to the net cost, counting federal financial participation (FFP), of ABI Waiver services and of all other Medicaid and state-funded services and supports for participants in the ABI Waiver program, including administrative and case management costs, compared to the net cost, counting FFP, of all Medicaid and state-funded services and supports for those participants if they were not enrolled in the ABI Waiver program. This calculation shall include historically based growth rate projections and actual costs to date for each service included in the calculation.

        a.     the number of participants that the defendants expect to serve during each year that the ABI Waiver is in effect;

        b.     applicable federal and state Medicaid requirements;

        c.     other applicable eligibility requirements, including: (i) the requirement that the prospective participant can be safely served in the community within the terms of the ABI Waiver and the cost limits described in ¶¶ 8 and 10 above, and consistent with CMS requirements for a Home- and Community-Based Service (HCBS) waiver; and (ii) any requirement with respect to nursing facility length of stay as a prerequisite to ABI Waiver participation; and

        d.     procedures for the evaluation and reevaluation of level of care. Appendix B will also describe an orderly, rational, and fair process for the consideration of applications for enrollment in the ABI Waiver and for the allocation of openings in the ABI Waiver.

The plaintiffs through counsel will have the opportunity to review and comment on Appendix B of the ABI Waiver proposal prior to submission to CMS.

        12.     The defendants will develop and implement policies and procedures for administration of the ABI Waiver concerning the following: (1) waiver application; (2) eligibility criteria; (3) appeals, including as stated in ¶ 5, above; (4) needs assessment; (5) service provision; and (6) establishing a process for quality management that incorporates each of the seven elements and sub-elements of CMS's HCBS Quality Framework, as described in CMS's August 29, 2002 letter to State Medicaid Directors.  The plaintiffs through counsel will have an opportunity to review and comment on these policies and procedures before they are finalized.

13.     For the ABI Waiver that covers residential habilitation services, eligible persons with an acquired brain injury as defined in footnote 1 above will participate in the ABI Waiver according to the following schedule:

a.     Not later than six months after CMS approval of the ABI Waiver, the defendants will begin implementation of the education and outreach plan described in ¶ 18, below.

b.     Not later than nine months after CMS approval of the ABI Waiver, the defendants will begin to select eligible persons with an acquired brain injury for participation in the ABI Waiver, subject to the cost neutrality limit of ¶ 8 above.

c.     Within fifteen months after CMS approval of the ABI Waiver that includes residential habilitation services, at least 35 Waiver participants with an acquired brain injury will begin to receive residential habilitation services, subject to the cost neutrality limit of ¶ 8 above.

d.     Within three years after CMS approval of the ABI Waiver that includes residential habilitation services, 100 Waiver participants with an acquired brain injury will begin to receive residential habilitation services, subject to the cost neutrality limit of ¶ 8 above and with the total number subject to the net state cost limit in ¶ 10 above.

14.     For the ABI Waiver that covers services other than residential habilitation services, eligible persons with an acquired brain injury as defined in footnote 1 above will participate in the ABI Waiver, according to the following schedule:

     a.     Not later than six months after CMS approval of the ABI Waiver, the defendants will begin implementation of the education and outreach plan described in ¶ 18, below.

     b.     Not later than nine months after CMS approval of the ABI Waiver, the defendants will begin to select eligible persons with an acquired brain injury for participation in the ABI Waiver, subject to the cost neutrality limit of ¶ 8 above.

     c.     Within 15 months after CMS approval of the ABI Waiver for services other than residential habilitation, at least 70 Waiver participants with an acquired brain injury will begin to receive the ABI Waiver services other than residential habilitation, subject to the cost neutrality limit of ¶ 8 above.

     d.     Within three years after CMS approval of the ABI Waiver for services other than residential habilitation, 200 Waiver participants with an acquired brain injury will begin to receive the ABI Waiver services other than residential habilitation, subject to the cost neutrality limit of ¶ 8 above and with the total number subject to the net state cost limit in ¶ 10.

15.     The defendants previously have submitted for CMS approval a proposal for a new Section 1115 demonstration project, called the Community First Demonstration Project. In the event that CMS does not approve the ABI Waiver, or approves it to serve fewer than 100 persons with an acquired brain injury with residential habilitation services, the defendants will monitor the Transition Group of the Community First Demonstration Project (hereafter, the "Transition Group"), as provided in ¶¶ 20 through 26, for one additional year beyond the commitment described in ¶ 21, below.

16.     The defendants will provide case management for all persons enrolled in the ABI Waiver.

17.     A senior staff person within the Executive Office of Health and Human Services will oversee and assist in the implementation of the ABI Waiver, including education and outreach efforts outlined in ¶ 18 and data collection and reporting outlined in ¶ 29. MRC shall be responsible for operating the ABI Waiver and for ensuring that the ABI Waiver requirements of this Settlement Agreement are implemented.

B.     *Education and Outreach Regarding Waiver Services*

18.     The defendants will develop and assist in implementing an education and outreach plan for persons with an acquired brain injury who are in nursing facilities and rehabilitation hospitals. The plan will describe all the services and supports that are available under the ABI Waiver and provide information regarding the Community First Demonstration Project to the extent available. The defendants will begin implementation of the plan as provided in ¶¶ 13-14. The plaintiffs through counsel will have an opportunity to review and comment upon the plan. The plan will include at least the following elements:

a.     the provision of written materials, such as mailings to persons with an acquired brain injury and their guardians and family members known to the plaintiffs or defendants through identification by advocacy organizations or others, and referral information for clinical department heads, case managers and social work staff at licensed facilities. The defendants will ask nursing facilities, rehabilitation hospitals, community service providers, and long-term care options

8

counseling entities, to provide these written materials to persons known to such providers or entities to have an acquired brain injury;

      b.     information sessions for residents of nursing facilities and rehabilitation hospitals that specialize in serving persons with an acquired brain injury;

      c.     a partnership with family and advocacy groups, including the Brain Injury Association of Massachusetts (BIAMA), in developing and implementing an outreach program, funded by the defendants, to persons with an acquired brain injury in nursing facilities and rehabilitation hospitals, including their guardians and family members, concerning the ABI Waiver services and the Community First Demonstration Project, and with particular attention to identifying and facilitating outreach towards persons with an acquired brain injury in units that specialize in the treatment of brain injuries;

      d.     assistance to persons with an acquired brain injury and their guardians and family members who seek information or support in applying for ABI Waiver services; and

      e.     education and outreach to the staff of nursing facilities and rehabilitation hospitals regarding the ABI Waiver criteria, procedures and services, and the Community First Demonstration Project, as well as the role of family and advocacy groups, including BIAMA, in the partnership described in (c) and in providing the individual assistance described in (d).

C.     *The Transition Group of the Community First Demonstration Project*

19.     The Community First Demonstration Project, previously referenced in ¶

15, is described in a project proposal submitted to CMS in December 2006 under Section

1115 of the Social Security Act.   As stated in the project proposal submitted to CMS, the

Community First Demonstration Project is "designed to prevent and/or delay admission

to, or facilitate discharge from, nursing facilities for targeted elders and adults with

disabilities in Massachusetts."   Assuming that CMS approves that proposal, the

defendants will take reasonable actions to implement the Community First Demonstration

Project proposal as approved by CMS, including the provisions relating to the "Imminent

Risk Group," subject to the limits of the Demonstration Project as approved.

20.     It is the defendants' intent that upon implementation, for each of the five

years of the Community First Demonstration Project and for each of the three years of its

initial renewal period, if any, at least twenty percent (20%) of the persons in the

Transition Group will be persons with an acquired brain injury ("the enrollment

percentage").   The defendants will monitor the Transition Group at least semi-annually to

assess progress towards achieving the enrollment percentage and to determine if the

enrollment percentage has been achieved for each year.

21.     If the monitoring described in ¶ 20 of this Agreement indicates that less

than twenty percent of the persons in the Transition Group in a given year are persons

with an acquired brain injury, the defendants will conduct an analysis of the reasons for

the percentage distribution.   In conducting that analysis, the defendants will collect and

consider the following aggregate data, along with other information: the number of

applications for the Transition Group received from persons with an acquired brain

injury; the number of applications for the Transition Group from persons with an acquired brain injury that were denied, if any, and the basis for denial (by category); and the number of persons with an acquired brain injury on a waiting list for the Transition Group, to the extent a waiting list exists.  After conducting that analysis, the defendants will take whatever reasonable actions they deem appropriate to achieve the enrollment percentage, including efforts to maximize the knowledge and understanding of persons with an acquired brain injury and their families and guardians about Transition Group services.  The defendants may take any actions, including, without limitation, the following:

> a.      an enhancement of the education and outreach activities described in ¶ 18; and

> b.      identification and referral of nursing facility residents – known to MRC staff and case managers or BIAMA – who have an acquired brain injury, including those under 60 years of age.

The plaintiffs through counsel will have an opportunity to review and comment upon the proposed actions.  The defendants will use their best efforts in performing these actions to ensure that twenty percent of the persons in the Transition Group are persons with an acquired brain injury.  As a result of the actions described above, and assuming that at least twenty percent of the Transition Group applicants are persons with an acquired brain injury, the defendants will, over the duration of the monitoring obligation set forth in ¶ 20 above, achieve the enrollment percentage.

> 22.     For monitoring purposes, the enrollment percentage will be calculated with respect to persons in nursing facilities with an acquired brain injury, excluding those

with Alzheimer's Disease and similar neuro-degenerative diseases the primary
manifestation of which is dementia.

23.     Persons with an acquired brain injury who move from a nursing facility to
the community and are part of the Community First Demonstration Project's Imminent
Risk Group will have access to those community services and supports available under
the Community First Demonstration Project for all persons in the Imminent Risk Group.

24.     If CMS approves the Community First Demonstration Project, persons
with an acquired brain injury who are moving from the Transition Group to the
community and will enroll in the Imminent Risk Group of the Demonstration Project may
be offered residential habilitation.  Any such persons who are offered residential
habilitation will be offered the choice to receive services in the most integrated setting
appropriate to their needs, such as their own homes or apartments, shared living
arrangements such as group homes, or with their families.  This provision does not create
an obligation to purchase a house, apartment, or other dwelling for a class member, and is
subject to all of the terms of the Community First Demonstration Project.

25.     The defendants will develop and implement policies and procedures for
administration of the Transition Group and the Imminent Risk Group concerning the
following: (1) application process; (2) eligibility criteria and determinations; (3) appeals
of denials, suspensions, reductions, and terminations of services through a fair hearing
process; (4) needs assessment and care plan development consistent with the principles of
the HCBS Quality Framework (Factor 2); (5) service provision; and (6) establishment of
a process for quality management that is consistent with or incorporates each of the
elements and sub-elements of CMS's HCBS Quality Framework, as described in CMS's

August 29, 2002 letter to State Medicaid Directors. The defendants will ensure that those staff responsible for assessing the needs of and developing a care plan for a person with an acquired brain injury who is enrolled in the Transition Group will have the appropriate knowledge and understanding of the needs of persons with an acquired brain injury. The plaintiffs through counsel will have an opportunity to review and comment on these policies and procedures before they are finalized.

26.     If in any year of the Community First Demonstration Project, the participation in the Transition Group by persons with an acquired brain injury exceeds the enrollment percentage, any amount above this percentage may be applied to the calculation of the enrollment percentage in the subsequent year. If at the end of the initial five years of monitoring, except as modified by the provisions of ¶ 15, above, the participation in the Transition Group by persons with an acquired brain injury on average exceeds thirty percent, the obligation to engage in monitoring during the initial renewal period, as outlined in ¶ 20, will be deemed fulfilled.

27.     Following CMS approval of the Community First Demonstration Project, the defendants will submit a protocol document to CMS that will describe the applicable Medicaid eligibility requirements for the Transition Group, and the requirements and procedures for participation in the Transition Group. The protocol document will describe case management and the plan of care process for the participants in the Transition Group. The protocol document will also describe the procedures that the defendants will employ to inform persons and their families and guardians about the services and supports that are available in the community under the Community First Demonstration Project, and how to apply for such services, including the eligibility

criteria, the waiting list, if any, and any appeal process for the denial of such services and supports. The protocol document will describe an orderly, rational, and fair process for the allocation of openings in the Transition Group. The plaintiffs through counsel will have the opportunity to review and comment on the protocol document prior to submission to CMS.

28.    A senior staff person within the Executive Office of Health and Human Services will oversee the implementation of ¶¶ 20 through 27 and ¶ 30. The Commonwealth shall designate an agency or agencies to be responsible for operating the Community First Demonstration Project and for ensuring that the Community First Demonstration Project requirements of this Settlement Agreement are implemented.

D.    *Data Collection and Reporting*

29.    For the ABI Waiver, the defendants will collect and report semi-annually to the plaintiffs on the following aggregate data for the duration of the monitoring of the Transition Group outlined in ¶ 20, based on the defendants' experience during the prior six-month period with respect to persons participating in the ABI Waiver:

a.    the number of applications received for the ABI Waiver;

b.    the number of persons with an acquired brain injury enrolled in the ABI Waiver;

c.    the number of applications for the ABI Waiver that were denied, if any, and the basis for denial (by category);

d.    the number of persons on a waiting list for the ABI Waiver, to the extent a waiting list exists;

14

   e.  the ABI Waiver services provided to persons participating in the

ABI Waiver; and

   f.  the number of persons participating in the ABI Waiver who live in

the community.

  30.  For the Transition Group, the defendants will collect and report semi-

annually to the plaintiffs on the following aggregate data for the duration of the

monitoring outlined in ¶ 20, based on the defendants' experience during the prior six-

month period with respect to persons with an acquired brain injury participating in the

Transition Group:

   a.  the number of applications received for the Transition Group;

   b.  the number of persons with an acquired brain injury enrolled in the

Transition Group;

   c.  the number of applications for the Transition Group that were

denied, if any, and the basis for denial (by category);

   d.  the number of persons on a waiting list for the Transition Group, to

the extent a waiting list exists;

   e.  the Transition Group services provided to persons participating in

the Transition Group; and

   f.  the number of persons who participated in the Transition Group

who live in the community.

  31.  To the extent authorized by protective orders in this case, the defendants

shall provide the plaintiffs' counsel with (a) the names, addresses, and telephone

numbers, of persons with an acquired brain injury who are participating in the ABI

Waiver, and of their guardians, if any, and the ISPs of such ABI Waiver participants; (b) the names, addresses, and telephone numbers of persons with an acquired brain injury who are participating in the Transition Group, and of their guardians, if any; and (c) the names, addresses, and telephone numbers of persons with an acquired brain injury who have moved from the Transition Group to the Imminent Risk Group of the Community First Demonstration Project, and of their guardians, if any. This provision does not create a continuing obligation to provide the above information after the individual is living in the community.

**II.    Nursing Facility Admission and Services**

32.    The defendants will not pay for the stay of a person with an acquired brain injury in a nursing facility unless the requirements in duly promulgated regulations set forth at 130 CMR 456.407 and 130 CMR 456.408 are met. The defendants will assist nursing facilities, long-term care options counseling entities and other community-based organizations in making available to individuals in nursing facilities or planning to enter nursing facilities, information about community service options.

33.    For persons with an acquired brain injury in nursing facilities who are preparing to transition to the community through participation in the ABI Waiver and/or the Community First Demonstration Project, the defendants will make payments to therapists in accordance with duly promulgated regulations set forth at 130 CMR 432 and 130 CMR 450 for ongoing therapy services. Any appeal of the denial, suspension, reduction or termination of payment for therapy services will be pursuant to the fair hearing process described in 42 C.F.R. § 431.200 *et seq.*

34.     The ABI Waiver service coordinator and the Community First Transition Group case manager shall make best efforts to communicate with licensed clinicians in the nursing facility who are responsible for the care of an ABI Waiver participant in a nursing facility, or a Transition Group participant in a nursing facility, so that the transitional service component of the transition planning process is coordinated with the participant's medical care, including necessary therapies.

## III.   Funding

35.     The defendants' obligations under this Agreement are subject to appropriations by the Legislature and the availability of FFP for the ABI Waiver, State Plan services, and the Community First Demonstration Project.  In order to implement this Agreement, which resolves the federal statutory claims set forth in the Amended Complaint, the defendants will submit budget requests as needed and will, consistent with Art. 63 of the Massachusetts Constitution, make their best efforts to obtain the funding necessary to implement this Agreement.

## IV.   Court Approval and Enforcement

36.     This Settlement Agreement represents a full and fair resolution of the claims for relief alleged in the Complaint.

37.     In preparation for a fairness hearing pursuant to Fed. R. Civ. P. 23(e), the parties will jointly file a motion for preliminary approval of this Settlement Agreement together with a notice of this settlement that describes the process for filing written objections and includes the date for the fairness hearing.  The parties will cooperate in presenting this Agreement to the Court at the fairness hearing.

38.     This Settlement Agreement shall be subject to the approval of the Court.  If the Agreement is so approved, it may be enforced only as set forth in ¶¶ 40 through 44 below.

39.     If the Court does not approve this Settlement Agreement in all respects, the Agreement shall be null and void and of no force and effect, and nothing herein shall be deemed to prejudice the position of any of the parties with respect to the litigation or otherwise, and neither the existence of this Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be admissible in evidence, referred to for any purpose in the litigation or in any other litigation or proceeding, or construed as an admission, presumption or concession by defendants of any liability or the truth of any of the allegations in this litigation.

40.     The Court shall retain jurisdiction to hear and adjudicate noncompliance motions filed in accordance with ¶¶ 43 through 44, below.

41.     No less than thirty days prior to filing any noncompliance motion,  the plaintiffs shall notify the defendants of any alleged noncompliance with this Settlement Agreement and request a meeting for the purpose of attempting to resolve the problems identified by the plaintiffs regarding the defendants' alleged noncompliance.

42.     Should the parties fail to resolve the problems identified by the plaintiffs, the parties shall engage in mediation with a mutually acceptable mediator.

43.     Should the parties fail to resolve, through mediation, any problems identified by the plaintiffs, the plaintiffs may file a motion with the Court seeking a judicial determination that the defendants are not substantially complying with the Settlement Agreement.  The defendants shall have no less than thirty days to respond to any such

motion. If the Court finds that the defendants have not substantially complied with the Settlement Agreement, it may enter an order consistent with equitable principles, but not an order of contempt, that is designed to achieve compliance.

44.     If the plaintiffs contend that the defendants have not complied with an order entered under the preceding paragraph, they may, after reasonable notice to defendants, move for further relief from the Court to obtain compliance with the Court's prior order. In ruling on such a motion, the Court may apply equitable principles and may use any appropriate equitable or remedial power then available to it.

45.     The Court shall dismiss this action with prejudice after the defendants have performed their obligations under ¶¶ 13 – 15, ¶¶ 20 – 21, and ¶ 26 of this Settlement Agreement and at that time are in substantial compliance with all other obligations under the Settlement Agreement. The defendants will provide the plaintiffs with at least sixty days' notice of their intent to seek dismissal. If the parties agree that the defendants are entitled to dismissal, the parties will execute and file with the Court a joint motion for dismissal with prejudice of all claims for relief arising out of the Complaint. If the parties do not agree, the defendants may independently move for entry of such a dismissal. The plaintiffs shall have up to sixty days to oppose such a motion.

## V.     Miscellaneous

46.     The parties shall meet quarterly to discuss any issues relevant to implementation of the Settlement Agreement.

47.     Either party may move to vacate the Settlement Agreement and the plaintiffs may proceed with litigating the case in any of the following circumstances:

     a.    If the Legislature does not appropriate and the defendants do not obtain from other sources the necessary funding to perform their obligations under this Settlement Agreement;

     b.    CMS does not approve the Community First Demonstration Project described herein or approves it in a manner that impedes or precludes compliance with the provisions of this Settlement Agreement; or

     c.    The defendants substantially modify, cap, or discontinue the ABI Waiver services or service capacity for participants in the ABI Waiver, as described in ¶¶ 2 through 14 above, in a manner that impedes or precludes compliance with the provisions of this Settlement Agreement.

48.    By mutual agreement, the parties may change the terms of this Settlement Agreement, including, but not limited to, the timetables for taking specific actions, provided that such mutual agreement is memorialized in writing, signed by the parties and approved by the Court.

49.    The headings of the sections of this Settlement Agreement are for convenience only and will not affect the construction hereof.

50.    This Settlement Agreement constitutes the entire agreement of the parties, and supersedes all prior agreements, representations, negotiations, and undertakings not set forth or incorporated herein.

51.    Neither this Settlement Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be construed against either party as an admission, presumption, concession or finding of liability or wrongdoing.

52.     The parties will, by motion, jointly seek a modification of the existing protective order to permit the plaintiffs' counsel to obtain: (i) from the defendants, the names, addresses, and telephone numbers, of persons with an acquired brain injury who are participating in the ABI Waiver, and of their guardians, if any, and the ISPs of such ABI Waiver participants; (ii) from the defendants, the names, addresses, and telephone numbers of persons with an acquired brain injury who are participating in the Transition Group and of their guardians, if any, and the names, addresses, and telephone numbers of persons with an acquired brain injury who have moved from the Transition Group into the Imminent Risk Group and of their guardians, if any; (iii) from the community providers and private healthcare facilities or organizations that serve persons with an acquired brain injury, the protected healthcare information, as defined under the Health Insurance Portability & Accountability Act of 1996, of such persons. The form of the motion shall be as set forth in Attachment A to this Agreement. The defendants shall notify nursing facilities, rehabilitation hospitals, and community providers that the Center for Public Representation and Wilmer Cutler Pickering Hale and Dorr LLP represent a class of persons with an acquired brain injury and that the United States District Court has entered a protective order (which shall be attached to the notification) with respect to that class. The form of the notification shall be as set forth in Attachment B to this Agreement.

53.     This Settlement Agreement is the result of arm's-length negotiations. Since the plaintiffs and the defendants contributed substantially, materially and cooperatively in drafting this Agreement, it shall not be more strictly construed against one party than the other.

For The Plaintiffs,

Steven J. Schwartz, Esq.
Center for Public Representation
22 Green Street
Northampton, MA 01060
Date: May 30, 2008

Richard A. Johnston, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
Date: May 30, 2000

Ms. Arlene Korab, Executive Director
Brain Injury Association of Massachusetts
30 Lyman Street, Suite 10
Westborough, MA 01581
Date: 5/30/08

For the Defendants,

Secretary Leslie A. Kirwan
Executive Office for Administration and Finance
State House, Room 373
Boston, MA 02133
Date: 5/30/08

Secretary JudyAnn Bigby, M.D.
Executive Office of Health and Human Services
One Ashburton Place
Boston, MA 02108
Date: 5/30/08

22